NO. 83-453

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

RAY GROSSMAN,

Plaintiff and Appellant,

vs.

STATE OF MONTANA, DEPARTMENT OF
NATURAL RESOURCES, et al.,

Defendants and Respondents.

ORIGINAL PROCEEDING:

Counsel of Record:

For Appellant:

Hooks and Budewitz, Townsend, Montana
Patrick F. Hooks argued, Townsend, Montana

For Respondents:

Hon. Governor Ted Schwinden, Helena, Montana
Hon. Mike Greely, Attorney General, Helena, Montana
Hon. Jim Waltermire, Secretary of State, Helena,
 Montana
Leo Berry, Department of Natural Resources, Helena,
 Montana
Robert Lane argued, DNR., Helena, Montana
Oitzinger and Mullendore, Helena, Montana
John J. Oitzinger argued, Helena, Montana
Mike Young, Dept. of Admin., Helena, Montana
G. Steven Brown, BNR., Helena, Montana

Submitted: March 1, 1984

Decided: May 7, 1984

Filed: MAY 8 1984

Ethel M. Harrison

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

At issue here is the state constitutionality of several acts of the legislature allowing the issuance of state revenue bonds. These bonds would be financed by coal severance taxes to provide proceeds for the development of state water resources. This action requires a decision by the Court not only on the state constitutionality of the enactment by the legislature of the enabling provisions, but also the state constitutionality of the application of the bond proceeds to the projects proposed by the legislature to receive such proceeds.

We hold the enactments of the statutes hereinafter enumerated and discussed relating to the revenue bonds in question are in accord with our state constitution; and that the proposed uses of the bond proceeds are likewise consonant with the state constitution.

I.

Ray Grossman is a self-employed citizen of the United States of America and a citizen, resident and registered elector of Montana, residing in Townsend, Broadwater County. He owns real and personal property on which he pays the State and its subdivisions real and personal property taxes. He also pays the State income tax on his earnings.

Grossman contends that Ch. 505, Laws of Montana (1981); H.B. 846 (47th Leg. Assembly); and H.B. 885 (48th Leg. Assembly), enacted as Ch. 705, Laws of Montana (1983), are void and unconstitutional. In support of his claims, he filed a complaint for declaratory judgment in this Court requesting us to take original jurisdiction. The respondents

have answered the complaint urging us to accept jurisdiction, and supporting in all particulars the state constitutionality of the disputed acts. The respondents further request that we grant summary judgment in favor of the State. This Court reserved the question of assumption of jurisdiction, and granted oral argument on all phases of the issues. The parties have stipulated, and it appears from the record, that there are no fact issues before us, only questions of law.

II.

Original jurisdiction depends on the resolution of two questions: (1) Whether the Supreme Court has original jurisdiction of such a declaratory judgment action; and (2) if it has jurisdiction, whether Grossman has standing to bring the action.

The original jurisdiction of this Court is defined in Art. VII, § 2, 1972 Mont. Const., where it is provided that we may "issue, hear, and determine writs of habeas corpus and such other writs as may be provided by law."

The state constitutional grant of original jurisdiction in this Court is open to interpretation. The grant was interpreted favorably to acceptance by the Court in Forty-Second Legislative Assembly v. Lennon (1971), 156 Mont. 416, 420-22, 481 P.2d 330, where, interpreting the 1889 Mont. Const., Art. VIII, § 3, Justice Haswell (now Chief Justice) wrote for the Court:

> "A declaratory judgment action is a proper proceeding in which to reach and answer the legal issues raised in this proceeding. A court of record in Montana is specifically granted the power 'to declare rights, status, and other legal relations' of a party (section 93-8901, R.C.M. 1947) [now section 27-8-201, MCA] which 'are affected by a statute' (section 93-8902, R.C.M. 1947) [now section 27-8-202, MCA] and in which a declaratory judgment 'will terminate the controversy or remove an uncertainty.' (section

93-8905, R.C.M. 1947) [now section 27-8-205, MCA.]
This is precisely the situation that exists in the
present case. Here we have a presently existing
bona fide, justiciable, legal controversy
concerning the authority of the legislative
assembly under the constitution and statutes of
Montana in enacting mandatory enabling legislation
for a constitutional convention. Resolution of the
issues presented herein is necessary to eliminate
or reduce a multiplicity of future litigation; to
prevent interminable delay in the election of
delegates, the formation, and the functioning of
the constitutional convention; and to eliminate
needless expenditure of public funds on procedures
that otherwise might subsequently be declared
illegal. One of the basic purposes of the Montana
Declaratory Judgments Act is to provide a procedure
for advance determination of such issues, thereby
eliminating these otherwise detrimental results.

"Under the circumstances of the present case, an
original proceeding for declaratory judgment in the
Supreme Court is likewise authorized. Jurisdiction
is granted this Court to hear and determine 'such
other original and remedial writs as may be
necessary or proper to the complete exercise of its
appellate jurisdiction. (Art. VII, § 3, [1889]
Montana Constitution.) A similar provision exists
by statute (section 93-214, R.C.M. 1947) [now
section 3-2-203, MCA], and Montana case law is
replete with authority sustaining the original
jurisdiction of the Supreme Court in declaratory
judgment actions in a variety of situations (citing
authority). The foregoing cases establish the
original jurisdiction of the Supreme Court in a
declaratory judgment action where legal questions
of an emergency nature are presented and ordinary
legal procedures will not afford timely or adequate
relief. Such is the situation here. We have an
urgent emergency situation in view of the mandatory
legislation required of the present session of the
legislative assembly, the absence of any factual
controversy but only pure legal questions that must
ultimately be answered by this Court in any event,
and ordinary legal procedures that will not afford
timely relief."

The wording of the judicial article defining our
original jurisdiction contained in the 1972 Montana
Constitution is different from the provisions of the judicial
article of the 1889 Montana Constitution. Does that
difference mean that the original jurisdiction power of this
Court is less than we perceived it to be in Lennon?

- 4 -

During the Constitutional Convention, on March 9, 1972, the Committee on Style, Drafting, Transition and Submission reported on the judicial article for submission to the convention. (Tr. at 911, 913, 1972 Montana Constitutional Convention Proceedings.) Art. VII(2)(1), came before the convention floor on March 13, 1972, in the following form:

> "SUPREME COURT JURISDICTION. (1) The supreme court has appellate jurisdiction and may issue, hear, and determine writs appropriate thereto. It has original jurisdiction to issue, hear, and determine writs of habeas corpus."

Motion was made to add to the subsection we have quoted above, the language "and such other writs as may be provided by law." In a floor discussion Delegate Berg told the convention:

> "DELEGATE BERG: Mr. Chairman. I join, of course, in this motion to reconsider. It developed that after we had written the article, Sandra Muckelston, the research analyst, pointed out to us a case in the Montana Supreme Court, known as Naegele v. Kelsey, in which the Supreme Court held that under the old Constitution there was some question, perhaps, as to whether writs--remedial writs--might be issued if it was limited to appellate jurisdiction as we had written it here. It is to correct that possibility that we ask that this amendment be made so as to conform with what the Supreme Court has already determined its jurisdiction to be." (Emphasis added.) Tr. at 2178, 1972 Montana Constitutional Convention.

When on March 13, 1972, the Montana Constitutional Convention was acting on Art. VII, § 2(1), the Lennon decision was already in the books, it having been decided on February 19, 1971. It appears evident from the discussion of Delegate Berg that it was the intention of the delegates to the 1972 constitutional convention that our original jurisdiction, as interpreted by the Supreme Court, be continued. The amendment was adopted by the 1972 Montana Constitutional Convention, so that the present form of Art. VII, § 2(1), is:

"Section 2. Supreme court jurisdiction. (1) The supreme court has appellate jurisdiction and may issue, hear, and determine writs appropriate thereto. It has original jurisdiction to issue, hear, and determine writs of habeas corpus and such other writs as may be provided by law."

The decision referred to by Delegate Berg in the constitutional convention is State ex rel. Nagle v. Kelsey (1936), 102 Mont. 8, 55 P.2d 685. In that case the Court discussed whether it had jurisdiction to accept an original proceeding for a writ of quo warranto. The contention was made that an original proceeding was not appropriate to the appellate jurisdiction, and therefore this Court had no jurisdiction. In refuting the contention, this Court pointed out in Kelsey that in the 1881 case of In re MacKnight (1891), 11 Mont. 126, 27 P. 336, then Justice Harwood, writing for the Court, said that for more than 40 years, even before we entered statehood, the jurisdiction of this Court was not limited solely to such writs as may relate to the exercise of its appellate jurisdiction.

An action for declaratory judgment is "provided by law" as was noted in Lennon. It might be contended that a declaratory judgment action is not one for the issuance of a "writ." That contention would favor form over substance. The relief in this case, if Grossman were to be successful in his contentions, would have the force and effect of a writ of prohibition against the state officers. We therefore determine that the rule in Lennon, which was applicable to the 1889 Constitution, is equally applicable to the original jurisdiction of this Court under the 1972 Montana Constitution.

The factors described in Lennon are present here. In the record of this case, we find that the underwriters and

bond purchasers sought to obtain an unqualified legal opinion from recognized bond counsel as to the legal validity of bonds and the underlying security arrangements. Montana lawyers had refused to issue an unqualified opinion, raising several possible issues to be first determined, including most of the issues raised in this case. The underwriters have been advised by their counsel in writing that it would be imprudent for the underwriters and the State to proceed with the proposed water development program financing without a conclusive resolution by this Court of all the relevant legal issues relating to the bonds. Without a final decision by this Court, the bonds are in effect unmarketable, or may be sold only with an excessive premium. Even the time it would take to begin this action in District Court and then appeal to this Court is a major deterrent. If we should find here constitutional objections which would negate the issuance of the bonds, decision by us now will be in sufficient time to alert the legislature to such amendatory provisions as may be necessary when it convenes in 1985.

We therefore hold that this Court does have original jurisdiction to accept declaratory judgment proceedings where the issues have impact of major importance on a statewide basis, or upon a major segment of the state, and where the purpose of the declaratory judgment proceedings will serve the office of a writ provided by law, in accordance with Art. VII, § 2(1), 1972 Mont. Const.

The second problem to be resolved if we are to accept jurisdiction of this case is whether Grossman has standing to sue. His complaint alleges that he is a citizen, resident, elector, and taxpayer. In that stance, he is no different than any other citizen, resident, elector, or taxpayer in

- 7 -

this state.  He alleges no direct adverse impact on him by virtue of the legislative enactments that would not be felt by any other citizen, resident, elector, or taxpayer of the state.  In Chovanak v. Matthews (1948), 120 Mont. 520, 526-27, 188 P.2d 582, 585, we held:

> "And the Supreme Court holds that to invoke judicial power to disregard a statute as unconstitutional, the party who assails it must show, not only that the statute is invalid, but that he has sustained, or is in immediate danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally. (Citing cases.)
>
> ". . .
>
> "The interest shown by appellant is only his interest as a citizen, elector, taxpayer and resident of Lewis and Clark County.  This is the same interest that the other citizens, electors, taxpayers, and residents of the county have in the matter, and it is not such interest as is permitted to invoke the exercise of the judicial power of determining whether an Act of the legislature is violative of the Constitution."

The pronouncement in Chovanak was repeated in effect in Stewart v. Board of County Commissioners (1977), 175 Mont. 197, 201, 573 P.2d 184, 186, where we said:

> "From these cases we synthesize that the issue presented for review must represent a 'case' or 'controversy' within the judicial cognizance of the state sovereignty.  Additionally, the following minimum criteria are necessary to establish standing to sue a governmental entity:  (1) The complaining party must clearly allege past, present or threatened injury to a property or civil right; and (2) the alleged injury must be distinguishable from the injury to the public generally, but the injury need not be exclusive to the complaining party."

Respondents have not objected to Grossman's complaint on the ground that he has no standing.  We noted, however, in Stewart, that objections to standing cannot be waived and may be raised by the court sua sponte.  175 Mont. at 204, 573 P.2d at 188.  In view of the importance of the issues here,

we must specifically determine whether assuming jurisdiction of Grossman's complaint is consonant with our laws and the decided cases.

There is no question that this Court will recognize standing in a taxpayer who is directly adversely affected by a proposed assessment and levy of taxes upon him. State ex rel. Conrad v. Managhan (1971), 157 Mont. 335, 338, 485 P.2d 948, 950.

Conrad was a class action where timberland owners were directly affected by the refusal of 5 northwestern counties to accept the amount of land valuation increases for tax purposes mandated by the then State Board of Equalization. There we held that a landowner had standing to bring a class declaratory judgment action, and need not go to the extreme of paying property taxes under protest and filing suit for recovery. See also, State ex rel. Fulton v. District Court (1961), 139 Mont. 573, 366 P.2d 435; Northwest Improvement Company v. Rosebud County (1955), 129 Mont. 412, 288 P.2d 657; Brophy Coal Company v. Matthews (1951), 125 Mont. 212, 233 P.2d 397.

The rule that a taxpayer must be directly adversely affected to bring an action contesting the validity of state bonds or the use of tax monies is not as unbendable as our pronouncements in Chovanak and Stewart, make it seem. For example in Huber v. Groff (1976), 171 Mont. 442, 558 P.2d 1124, we accepted original jurisdiction where the plaintiff, a taxpayer, sought to have the Housing Act of 1975 declared unconstitutional on several grounds. Huber's standing was not discussed. In State ex rel. Ward v. Anderson (1971), 158 Mont. 279, 491 P.2d 868, this Court accepted original jurisdiction of an injunction proceeding to determine the

validity of bonds to be funded by tobacco taxes, income and corporation license tax collections, and separate bonds to be funded by a gasoline license tax. In Lodge v. Ayers (1939), 108 Mont. 527, 91 P.2d 691, this Court accepted the original application of a taxpayer who contested the validity of refunding a bonded indebtedness on which the state had defaulted or was threatening to default by issuance of new bonds. In Martin v. State Highway Commission (1939), 107 Mont. 603, 88 P.2d 41, an original application for injunction to sustain the issuance of debentures funded by a tax on motor fuels was accepted without discussion as to the status of the plaintiff. There are other examples.

From these cases it will be seen that we must add a further exception to the strictures on standing announced in Chovanak and Stewart above. We will recognize the standing of a taxpayer, without more, to question the state constitutional validity of a tax or use of tax monies where the issue or issues presented directly affect the constitutional validity of the state or its political subdivisions acting to collect the tax, issue bonds, or use the proceeds thereof. This is not to say we encourage original filings in this Court by taxpayers. The district courts in most cases are open as the starting forum for many of such controversies. It is when special circumstances, presenting issues of an urgent or emergency nature, exist requiring speedy determination, that we deem it wise to accept original jurisdiction, and to recognize standing of an ordinary taxpayer for that proceeding.

The urgent and emergency factors which excite our acceptance of original jurisdiction here and drape the taxpayer Grossman with standing are these: Grossman

challenges the constitutionality of various aspects of the State's coal severance tax bond program; the State cannot issue any of the proposed coal severance tax bonds authorized by the legislature until the issues raised by the plaintiff have been resolved by this Court; a District Court opinion is not sufficiently authoritative to provide underwriters and investors with a final resolution of the constitutional issues involved; unless we accept jurisdiction the issuance of bonds will be delayed by several months if District Court proceedings are required and the bonds are found valid; if we do not accept jurisdiction and the bonds are not found to be valid, the process of litigation may well go past the period when the 1985 legislative assembly will convene, meet and adjourn; and the health and welfare of a large segment of the State's population may well be bettered if the bonds are found valid and the proceeds used for the envisioned projects.

From the economic viewpoint of the State as a whole, from the viewpoint of the use of tax monies to develop water resources, from the viewpoint of a legislative break from the past in the constitutional use of State monies for the improvement of the human condition of our residents, no more important case has come before this Court. We hold ourselves as a court to have authority over the subject matter and over the parties.

We should without hesitancy recognize this case for what it appears to be: a test case designed to obtain a final judgment on the validity of coal severance tax revenue bonds so that if valid, the bonds will be marketable. We will no longer be qualmish about jurisdiction in a bond issuance case. When the issues are fairly stated, fully explored and

vigorously contended, as they appear here, we have a justiciable controversy suitable for final resolution by this Court. Legal niceties must bend on occasion to the reality of the market. The living law moves with the times.

We assume jurisdiction.

### III.

Montana taxes the production of coal within its borders by imposing a tax on severance of coal ranging from 20% to 30% of value for strip mining, and 3% to 4% of value for underground mining, the range depending in each type of mining on the B.T.U. per pound of coal produced. Section 15-35-103, MCA.

Tax money produced by the severance of coal is allocated to several purposes, section 15-35-108, MCA, but under our state constitution 50% of the severance tax is dedicated to a permanent trust fund, the interest and income from which may be appropriated. The principal of the trust is inviolate unless appropriated by a vote of three-fourths of the members of each house of the legislature. 1972 Mont. Const., Art. IX, § 5.

Section 17-6-203(5), MCA, requires the separate investment of the permanent coal severance tax trust fund; but it also provides that the principal of the trust may gain or lose if any part of the principal is appropriated by the required three-fourths vote in each house.

In 1981, the legislature enacted Ch. 505, Laws of Montana (1981) which affects the principal of the permanent coal severance tax trust. The act created three funds within the trust, including a coal severance tax bond fund, a coal severance tax permanent fund, and a coal severance tax income fund. On December 31 and June 30 of each year the

State Treasurer must transfer into the coal severance tax permanent fund all monies in the bond fund except amounts necessary to meet principal and interest payments payable from the bond fund on the next semiannual payment dates. Section 17-5-703, MCA. More than three-quarters of the members of each house supported the enactment.

The money flowing into the coal severance tax bond fund comprises the constitutionally dedicated (50%) receipts from the tax. Section 17-5-703, MCA. That fund is pledged to the payment of principal and interest on all state-issued coal severance tax bonds. Section 17-5-705, MCA. The board of examiners was given authority upon approval of the legislature to issue and sell coal severance tax bonds to finance water development projects approved by the legislature. Section 17-5-706, MCA.

The legislature is required by section 17-5-709, MCA, to provide for "the continued assessment, levy, collection, and deposit" into the bond fund of the coal severance tax (apparently meaning the 50% constitutionally dedicated funds) which, with funds from other sources, will be sufficient to service the debt payments required by issued bonds.

The statutes go on to provide for the use of a fiscal agent by the State, to authorize trust indentures and a trustee, any trust company or bank with trust powers, to add provisions for the protection of bondholders, and to provide refunding. Sections 17-5-710(4), 17-5-711, 17-5-712, and 17-5-716, MCA. The State is further pledged not to impair bond obligations. Section 17-5-717, MCA. Nor may the total of bonds issued for water resource development exceed $250 million. Section 17-5-719, MCA.

We may explain the statutory scheme following the 1981 enactment thusly: The State will now deposit 50% of the coal severance tax revenues in a bond account pledged to the payment of State-issued bonds; monies which are not necessary to meet upcoming bond payments will be transferred on December 31 and June 30 of each year into the coal severance tax permanent fund. When water projects are approved by the legislature, and the issuance of coal severance tax bonds for such projects is also approved by the legislature, the State will issue and sell such bonds to obtain the proceeds necessary for the water projects. The bonded indebtedness, with interest thereon, will be paid for out of pledged coal severance tax revenues, or such obligations may be refunded in the future. When bonds are issued, each succeeding biennial legislative assembly must appropriate to the coal severance tax bond fund the monies necessary for the State to meet its obligations under the bonds for the ensuing biennium period. The obligation to appropriate such funds would not change if the legislature were hereafter required to meet annually.

Also included in Ch. 505, Laws of Montana (1981), was a water development program, now codified in sections 85-1-601 to 623, inclusive, MCA. Its aim is to provide long-term water development with financial and administrative assistance. Here is created a water development state special revenue fund (formerly an "earmarked fund") to accumulate from various sources funds for the operation and maintenance of State owned projects and works. Section 85-1-604, MCA.

Also created was a water development debt service fund derived from 1¼% of all coal severance taxes collected but

not otherwise allocated. Such fund may be used for grants and loans to State and local governments for water purposes. Sections 85-1-603, and 85-1-605, MCA.

Grants and loans to private persons may be appropriated out of the water development state special revenue account established in section 85-1-604, MCA, under the authority of section 85-1-606, MCA, up to 5 percent of said state special account or 25 percent of the project cost, whichever is less. Section 85-1-614, MCA.

The State is given a lien as security for any loan made from the state special revenue account or water development account. Section 85-1-615, MCA.

There are also provisions now in the code for the issuance and sale by the State of water development bonds upon authorization of a project by the legislature, funded by the water development debt service account, the source of which is $1\frac{1}{4}\%$ of the coal severance taxes. Sections 85-1-617, and 85-1-619, MCA. The proceeds of the bonds may be used only for loans in the water development program. Section 85-1-618, MCA.

The coal severance tax monies which pour into the water development debt service fund are kept separate from the monies from other sources which pour into the water development state special revenue fund, except that any surplus of funds in the debt service fund above debt service requirements then find their way into the state special revenue fund, where these and other monies may be spent for the purposes described in section 85-1-604, MCA.

With respect to bonds issued under the water development program the legislature is again obligated to provide sufficient funds from time to time as necessary to meet

promptly the full payment of principal and interest and redemption premiums when due on all bonds payable from the fund. Section 85-1-619, MCA.

The water development bond program outlined in Ch. 505, Laws of Montana (1981), cumulated in the authorization by the legislature for the issuance and sale of $5 million of water development bonds for loans in the water development program. Section 85-1-623, MCA.

Again the statutory scheme made be explained thusly: 1¼% of the coal severance tax revenues will go into a debt service fund for the purpose of funding and refunding the issuance and sale of bonds for water development. The proceeds of the sale of such bonds may be used only for loans for water development projects. The legislature also provided the accumulation of a state special revenue account fund from other sources described in section 85-1-604, MCA, but including the excess of the coal severance tax proceeds not required for debt service. The funds in the state special revenue account may be used for various projects including grants and loans to State and local governments, and grants and loans to private persons.

A further step taken by the legislature in 1981 was the passage and approval of House Bill 846. The legislature found that the Tongue River Dam is in a dangerously unsafe condition and needs repair and rehabilitation to prevent washout, flood, damage to property and possible loss of life. The legislature authorized, among other things, the issuance of bonds not exceeding $10 million in total face value to be funded and repaid from the coal severance tax permanent fund, hereinbefore described, and found in section 17-5-703, MCA.

In 1983, the legislature took further steps to provide funds for various State water projects. In Ch. 705, Laws of Montana (1983), it authorized the issuance of $45.35 million for the development of hydropower potential at Painted Rocks Dam, Broadwater Dam, and Cooney Dam; bonds not to exceed the total sum of $551,900 for the repair and rehabilitation of Yellow Water Dam in Petroleum County, Cottonwood Dam in Park County, and Martinsdale Dam in Meagher and Wheatland Counties; and $17,044,735 for loans to local government entities, including cities, towns, counties, soil conservation districts and irrigation districts, for 22 different water projects.

Thus, at the present time, the State has authorized the issuance of state water resource development bonds, to be financed and repaid out of coal severance tax revenues as herein described up to the following amounts under the following authorizations:

```
$  5,000,000        Section 85-1-623, MCA
  10,000,000        H.B. 846, Laws of Montana (1981)
  45,350,000        Ch. 705, § 3, Laws of Montana (1983)
     551,900        Ch. 705, § 4, Laws of Montana (1983)
  17,044,735        Ch. 705, § 5, Laws of Montana (1983)

$ 77,946,635
```

The 1981 legislature also included in its appropriations, in H.B. 709, Laws of Montana (1981), a $350,000 appropriation to the Department of Natural Resources and Conservation for the "small water projects construction loan program" administered by the Department to be paid for under the water development program we have hereinbefore described.

IV.

In §§ 5 and 6, Ch. 705, Laws of Montana (1983), (H.B. 885) the legislature authorized the issuance of coal

severance tax revenue bonds in an amount not to exceed $17,044,735 for the purpose of making loans from the bond proceeds to 21 political subdivisions and local government entities for 22 water development projects. Grossman contends that this authorization violates 1972 Mont. Const., Art. V, § 12: "The legislature shall not pass a special or local act when a general act is, or can be made, applicable."

Grossman contends that the appropriation of funds for favorable loans to a score of small municipalities, water districts and portions of a county constitutes special legislation, and is constitutionally invalid.

In presenting their arguments on this issue, all parties rely on earlier cases of this Court, some decided under the 1972 Montana Constitution, and others under the 1889 Montana Constitution. For the purposes of this opinion, we determine that the respective provisions in the two constitutions are essentially the same.

We would be skirting the issue if we did not readily admit that the effect of §§ 5 and 6, Ch. 705, Laws of Montana (1983), is special or local. The 22 projects authorized for loans under the bond program by the legislation relate to particular municipalities or particular governmental subdivisions on the basis of individual cases for less than a class and apply to particular members of a class particularized by the express terms of the act. Thus the sections seem to come within the definition of "special law" found in State ex rel. Powell v. State Bank of Moore (1931), 90 Mont. 539, 4 P.2d 717; State ex rel. Redman v. Meyers (1922), 65 Mont. 124, 210 P. 1064. Yet we do not find §§ 5 and 6, Ch. 705, Laws of Montana (1983), to be special or local acts which are prohibited by Art. V, § 12.

It is important to realize that the language of 1972 Mont. Const., Art. V, § 12, is not absolutely prohibitory. The legislature is enjoined from passing a special or local act only when a general act is or can be made applicable. We cannot imagine how the legislature could draft a general act of state-wide application providing for the issuance and sale of revenue bonds and at the same time keep a handle on the way the bond proceeds are to be spent or loaned except through its direct authorization of projects. This Court faced a similar problem in State ex rel. Ford v. Schofield (1917), 53 Mont. 502, 165 P. 594. There the legislature by a single act created Carter County. The act creating the county was attacked on the ground that it was special legislation, since there was in effect at the time a general statute providing for the organization and creation of new counties. In upholding the power of the legislature to create a single county where conditions had changed so as to make the operation of the general act inapplicable, this Court also looked at the question under the constitutional provision, who should decide whether a general law could be made applicable, the courts, or the legislature? It decided:

"We believe there are many subjects of legislation, which, from their inherent character, are subject to regulation by general laws, and that the courts are as advantageously situated as any other department of government to say so; on the other hand, there are certain subjects which may or may not lend themselves to regulation by general laws, depending upon extrinsic facts and circumstances which the Legislature is peculiarly fitted to ascertain and determine, but which the courts have no means available to ascertain. Upon the first class of subjects, the courts can and must determine the applicability of general laws; upon the second, the Legislature must be left free to act." 53 Mont. at 510-11, 165 P. at 596.

The legislature stated its purpose and policy in enacting Ch. 705, Laws of Montana (1983). It stated the

policy of Montana is to promote conservation, development and beneficial use of the state's water resources to secure maximum economic and social prosperity for its citizens. In section 1(6), it made specific findings that the water development projects to which objection is here made as local or special would "implement the state's policy of full use, conservation, and protection of its water resources." In that light, the legislature here, by specifying projects which it has authorized upon specific findings, is merely implementing a general rule within the purview of the constitution.

In Hotel Dorset Company v. Trust for Cultural Resources of City of New York (1978), 46 N.Y.2d 358, 385 N.E.2d 1284, a legislative act which provided support for financially troubled museums in the state of New York was attacked upon the ground that it benefited only the Museum of Modern Art in the City of New York. The New York Court of Appeals held:

> ". . . If the subject matter of the legislation is of sufficient importance to the State generally, the legislation cannot be deemed a local law even though it deals directly with the affairs of the municipality. This has been an accepted principle for many years, and there is ample showing from the legislative findings alone that the maintenance of cultural institutions is a State concern . . ." 385 N.E.2d at 1291.

The New York court also said:

> "Courts are required to exercise a large measure of restraint when considering highly intricate and imaginative schemes for public financing or for public expenditures designed to be in the public interest. Some may be highly controversial. But when a court reviews such a decision, it must operate on the rule that it may not substitute its judgment for that of the body which made the decision. Judges, however much they might disagree with the wisdom of the act under review, are not free to invalidate it on that ground.. . .

> ". . . We should not strain ourselves to find illegality in such programs. The problems of a modern city can never be solved unless arrangements

like these . . . are upheld, unless they are patently illegal . . ." 385 N.E.2d at 1289.

We regard the passage of Ch. 705, Laws of Montana (1983), as an implementation of the water development policy enunciated by the legislature and contained in sections 85-1-601 through 85-1-623, MCA. Section 85-1-605, MCA, provides that loans and grants may be made to a "department, agency, board, commission, or other division of state government or to a city, county, or other political subdivision or local government body of the state." No class of government entity is excluded. Therefore the water development financing program created by those statutes is "general" legislation within the meaning of 1972 Mont. Const., Art. V, § 12.

From either of two approaches therefore, we find that the provisions of §§ 5 and 6, Ch. 705, Laws of Montana (1983) are valid under Art. V, § 12 of the 1972 Montana Constitution. As an implementation of the water development financing program, it is within the "general" legislation; as a separately passed act authorizing loan from bond proceeds for local projects, even though they may be local in effect, these are provisions for which a general act can not be provided.

Grossman does not directly attack the remaining provisions of Ch. 705, Laws of Montana (1983), as having local effect, although the remaining provisions relate to hydroelectric development at three locations, and to three separate dams at other locations. To foreclose further argument, let it be said that our result under the 1972 Mont. Const., Art. V, § 12, would be the same.

Next Grossman attacks the validity of the legislative scheme that pledges each succeeding legislature to fund the debt payments of principal, interest, redemption costs and related expenses for the coal severance tax bonds. He characterizes this as a "continuing appropriation" which offends the intent, spirit and language of the 1972 Mont. Const., Art. IX, § 5.

Specifically, Grossman charges that section 17-5-705, MCA, which pledges the coal severance tax bond fund to the payment of coal severance tax bonds; section 17-5-709, MCA, which requires a continued deposit of coal severance tax collections into the bond fund; section 17-5-719, MCA, which limits such bonds to $250,000,000; and Ch. 705, Laws of Montana (1983), (H.B. 885) violate the constitutional provisions of Art. VIII, §§ 8, 9, and 14, and Art. IX, § 5.

We set out the state constitutional provisions involved:

"ARTICLE VIII. Section 8. State debt. No state debt shall be created unless authorized by a two-thirds vote of the members of each house of the legislature or a majority of the electors voting thereon. No state debt shall be created to cover deficits incurred because appropriations exceeded anticipated revenue.

"ARTICLE VIII. Section 9. Balanced budget. Appropriations by the legislature shall not exceed anticipated revenue.

"ARTICLE VIII. Section 14. Prohibited payments. Except for interest on the public debt, no money shall be paid out of the treasury unless upon an appropriation made by law and a warrant drawn by the proper officer in pursuance thereof.

"ARTICLE IX. Section 5. Severance tax on coal--trust fund. The legislature shall dedicate not less than one-fourth (¼) of the coal severance tax to a trust fund, the interest and income from which may be appropriated. The principal of the trust shall forever remain inviolate unless appropriated by vote of three-fourths (3/4) of the members of each house of the legislature. After December 31, 1979, at least fifty percent (50%) of

the severance tax shall be dedicated to the trust fund."

In essence, Grossman is saying that the 48th Legislative Assembly which met in 1983 may not constitutionally bind the 49th Legislative Assembly and each succeeding legislative assembly to "appropriate" the coal tax monies necessary to service the State coal tax bonds; that the 48th Legislative Assembly invaded the principal of the coal severance tax trust fund for years to come; and that each bond issue requires a separate appropriation of the coal severance tax revenues by a three-quarters vote of the members of each house of the legislature.

Grossman builds his case around the state constitutional provisions above, which limit each legislature to the anticipated revenues in the budget period for legislative appropriations, and the constitutional necessity of an appropriation before a state warrant for money can be issued against the appropriation.

Under the bond program it will certainly be the duty of each succeeding legislature to appropriate for the budget period for which the legislative assembly is responsible, sufficient monies within anticipated revenues, including monies out of the coal severance tax fund, to service the bonded indebtedness. Under the 1889 Montana Constitution, we held the power of each legislative assembly to bind the following assembles in the matter of long-term public debt to be clear:

> "The next contention is that the Act violates section 12 of Article XII of the [1889] Constitution, which provides that 'no appropriation of public money shall be made for a longer term than two years.' The word 'appropriation' as there used does not have application to an Act providing for the issuance of bonds or debentures, wherein the Act creating the debt also levies a tax

- 23 -

> sufficient to pay the debt (State ex rel. Bonner v.
> Dixon, supra). To hold otherwise would be to hold
> that a bond issue could never extend over a period
> of more than two years; because if a biennial
> appropriation to retire such a debt is necessary,
> the legislature would have the right to withhold
> the appropriation, and therefore the law creating
> the debt would, in effect, be repealable contrary
> to the command of section 2, Article XIII. The
> contention that the proceeds from the gasoline
> license tax sufficient to retire the debentures
> cannot be appropriated for more than two years is
> untenable." Martin v. State Highway Commission et
> al. (1939), 107 Mont. 603, 613, 88 P.2d 41, 46.

Under the 1889 Constitution, our Court used an escape clause in that constitution to justify continued required appropriations to service long-term public debt. This Court construed the word "appropriation" in the 1889 Constitution to apply only to the general fund, and not to special funds created by the legislature to retire the debt. State ex rel. Bonner v. Dixon (1921), 59 Mont. 58, 195 P. 841. We do not have the same language on which to rely in the 1972 Constitution. The result nevertheless must be the same.

In the construction of constitutional provisions, we use the same rules which are applicable to the construction of statutes. Matter of McCabe (1975), 168 Mont. 334, 544 P.2d 825. In construing broad and general provisions of the constitution which tend in measure to conflict with specific ones, we are controlled by specific provisions, Jones and Herriott v. Judge (1978), 176 Mont. 251, 577 P.2d 846, and an interpretation that achieves a reasonable result is favored, State v. Gafford (1977), 172 Mont. 380, 563 P.2d 1129. Neither statutory nor constitutional construction should lead to absurd results, if reasonable construction will avoid it. Billings Properties, Inc. v. Yellowstone County (1964), 144 Mont. 25, 394 P.2d 182. In determining the meaning of the constitution, the Court must keep in mind that it is not the

beginning of law for the state, but a constitution assumes the existence of a well understood system of law which is still to remain in force and to be administered, but under constitutional limitations. State ex rel. Hamshaw v. Justice Court of Union Township (1939), 108 Mont. 12, 88 P.2d 1.

The 1972 Montana Constitution continues the financial powers and duties imposed on the State by the 1889 State Constitution. In short, each legislative assembly may make appropriations for the coming budget period, which must not exceed anticipated revenue. 1972 Mont. Const., Art. VIII, § 9. No state debt may be created to cover deficits incurred because appropriations may have exceeded anticipated revenue. However state debt can be created by a two-thirds vote of the members of each house, 1972 Mont. Const., Art. VIII, § 8. Money borrowed on behalf of the state must be used only for the purposes specified in the authorizing law. 1972 Mont. Const., Art. VIII, § 11.

These constitutional provisions are easily harmonized. The state must live within its means as to its general expenditures, and must pay for new programs as it goes, without incurring debt. But if a project or new program will require the incurrence of debt, two-thirds of the members of each house can authorize it. Since the constitution provides for the use of borrowed funds, it undoubtedly follows that the state could in fact borrow money or create indebtedness. Incurrence of long-term debt through the issuance of bonds or similar instruments is a time-honored method of governmental financing at all levels. We hold it eminently clear that the legislature can authorize borrowing long-term by issuing and selling bonds, and can provide for the servicing for such indebtedness by repayment or refunding.

There is nothing inherently special about the coal severance trust fund provided in Art. IX, § 5, or the terms of that section, to insulate and make immune coal tax revenues from use as a funding source for long-term state bonds. Once three-quarters of the members of each house approve, the state can validly issue bonds or other debt instruments against coal tax revenues in the manner provided. In the water resource development program adopted by two sucessive legislatures, the 47th and 48th Legislative Assemblies by proper vote, the legislature has the power to invade the principal of the coal severance tax trust fund for such purpose. When the legislature validly acts to establish a debt under Art. VIII, § 8, that indebtedness becomes a state obligation extending over the life of the indebtedness, and every succeeding legislative assembly has an unavoidable duty to provide for it, in the manner required by the authorizing law. The provisions of the statutes herein mentioned, and of Ch. 705, Laws of Montana (1983), (H.B. 885), validly pledge the coal tax revenues so authorized for the repayment of the bonded indebtedness, and validly bind each succeeding legislative assembly to provide for their repayment.

The legislature has provided us with a unique and innovative water resource development program; but there is nothing new or alien about funding public long-term state bonds through dedicated revenues.

VI.

Grossman further argues that sections 17-5-701 through 17-5-719, MCA, Ch. 505, Laws of Montana (1981), (H.B. 846), and Ch. 705, Laws of Montana (1983), (H.B. 885) contain a pledge of money, an appropriation by the State and an

- 26 -

extension of state credit to pay bonds in the future although said bonds are and will be created for a term of more than two years. These provisions, he contends, violate the 1972 Mont. Const., Art. VIII, § 9: "Appropriations by the legislature shall not exceed anticipated revenue."

Grossman contends that the constitutional framers intended to continue the specific provision of the 1889 Mont. Const., Art. XII, § 12, which provided in pertinent part: "No appropriation of public moneys shall be made for a longer term than two years."

We agree with Grossman that the intention of the constitutional framers was that each legislative assembly should appropriate only for the next budget period and that such appropriations should not exceed anticipated revenue for such period. The reason that the framers of the 1972 Constitution did not include the clause "a longer term than two years" was because when the 1972 Constitution was first adopted it provided for annual instead of biennial sessions of the legislature. In 1974, 1972 Mont. Const., Art. V, § 6, was amended so that instead of a provision for meeting "at least once a year," the legislature is now required to meet "each odd-numbered year in regular session of not more than 90 legislative days." Constitutional Initiative No. 1.

We doubt that Grossman is serious that any legislative assembly could not, under the 1972 Montana Constitution, provide for public debt over a long term, and bind succeeding legislative assemblies to appropriate monies to cover that public debt. Such a construction would almost necessitate the convening of another constitutional convention to make specific such power. In any event, the matter was settled in Martin v. State Highway Commission (1939), 107 Mont. 603, 88

- 27 -

P.2d 41, and what we have said earlier in this connection in section V of this opinion covers our answer to this contention. We find no merit in the constitutional attack on the provision for binding succeeding legislative assemblies to provide for the payment of the long term public debt.

## VII.

Section 2, paragraph (2) of Ch. 705, Laws of Montana (1983), (H.B. 885), authorizes the creation of state debt by sale of coal severance tax bonds in an amount not to exceed $45.35 million for the development of hydroelectic power at three state-owned dams, Painted Rocks Dam, Broadwater Dam, and Cooney Dam. Under sections 85-1-501 through 85-1-513, MCA, the Department of Natural Resources and Conservation (DNRC) and the Board of Natural Resources and Conservation as governing board are mandated to make such hydroelectric projects, when completed, available for lease to public utilities and electric cooperatives or any Montana corporation proposing to use a substantial portion of the electricity to be generated in its own operation. Section 85-1-502, MCA. If no lease applications are received or if the board rejects all lease applications, the department itself may operate the hydroelectric generation facility.

Grossman states that this offends 1972 Mont. Const., Art. V, § 11(5):

> "No appropriations shall be made for religious, charitable, industrial, educational, or benevolent purposes to any private individual, private association, or private corporation not under control of the State."

We note that the legislature found that the hydroelectric developments named here would implement the State's policy of full use, conservation, and protection of

its water resources. Section 1(6)(a), Ch. 705, Laws of Montana (1983), (H.B. 885).

The legislature also provided that the bonds may not be issued by the Board of Examiners until the Board of Natural Resources and Conservation has determined that the projects are feasible, and otherwise comply with the requirements of law. Section 3(2), Ch. 705, Laws of Montana (1983), (H.B. 885).

Grossman contends that Art. V, § 11 of the 1972 Constitution is violated by these provisions which benefit, he claims, the public utilities and the rural electric cooperatives of the State, and possibly the "ABC Aluminum Company" that might want to come in and use cheap power.

The constitutional provision is not violated because the legislature may in making appropriations or other provisions in some way benefit incidentally various private individuals, associations or corporations not under the control of the state. As long as the provisions relating to the expenditures of the funds derived from the proceeds of the bonds are under the control of the state, the constitutional mandate is satisfied. Thus in Huber v. Groff (1976), 171 Mont. 442, 558 P.2d 1124, in construing the Housing Act of 1975, we found that even though the act directly benefits banks and other lenders who sold mortgages to the Montana Board of Housing, as well as builders of homes and individuals who received low interest mortgages as a result of that program, the Act was constitutional because the Housing Board was not a private corporation, but a public entity. "It received all of its powers directly from the legislature and its duties and responsibilities are set out

clearly by the statute which created it." 171 Mont. at 457, 558 P.2d at 1132.

In State ex rel. Normile v. Cooney (1935), 100 Mont. 391, 47 P.2d 637, this Court held that the issuance of revenue bonds by the State Water Conservation Board to finance an irrigation and flood control project did not violate a similar constitutional provision in the 1889 Montana Constitution though the project would benefit the shareholders of a private water users association, because the appropriation was made to an agency of the state and thereby served a public use.

In this case, the funds derived from the sale of the coal tax severance bonds, to the extent authorized, will be expended by a state agency under the control of the state for the construction of hydroelectric power projects. The appropriations therefore are made for an agency of the state, and not for a private person, association or corporation. The fact that the state may afterwards lease completed hydroelectric projects to a private association or corporation is no more offensive constitutionally than is the power of the state to lease its state-held lands to private parties. There is no merit in Grossman's contention under this section.

VIII.

Art. VIII, § 1 of the 1972 Montana Constitution provides: "Taxes shall be levied by general laws for public purposes."

Grossman avers that the legislative plan of appropriating $17 million from the proceeds of coal severance tax bonds for loans to cities, counties, and other political subdivisions or local governmental bodies violates Art. VIII,

- 30 -

§ 1. He contends that the funds used to service a debt of coal severance tax bonds are generated by the general taxing powers of the state and that the funds will not be used for public purposes but rather for financing special local purposes.

These contentions are weightless. The question of whether a particular purpose for which taxes may be levied and collected is a public purpose is for the legislature in the first instance, and the courts will indulge every reasonable presumption of favor of the legislative decision in this respect. Lewis and Clark County v. Industrial Accident Board (1916), 52 Mont. 6, 155 P. 268. The words "public purposes" are synonymous with "governmental purposes." State ex rel. Mills v. Dixon (1923), 66 Mont. 76, 90, 213 P. 227, 231.

The purposes for which these bonds are issued are set out more fully in § 6, Ch. 705, Laws of Montana (1983), (H.B. 885). We need not repeat them here. It is enough to say that for the most part the loans are authorized to provide financial aid for city water systems, water distribution systems, water supply treatment facilities, sewage treatment, construction to provide reliable supplies of water, and plans to alleviate water shortages. In one case a rural water system is authorized where presently water must be hauled for both domestic and stock water purposes. In each case the legislature has found specifically the public purpose involved, in some instances to resolve health hazards to the residents being served, to prevent health problems, to improve the quality of ground water, to improve the water supply performance, and to stabilize water supplies.

Hon. John C. Sheehy
Justice, Supreme Court
Room 414 Justice Building
215 North Sanders
Helena, Montana  59620

CORRECTION. In preparing this opinion for publication, we noted in our verification of titles and citations the matters listed below. Corrections have been made on our copy of the opinion.

Date:

Re:     July 10, 1984

        Grossman v. State Dept. of Natural Resources, No. 83-453, May 7, 1984

Page 32, line 7 --- Lumberman's Trust Co. v. Ryegate should read Lumbermen's Trust Co. v. Ryegate.

Page 37, line 6 --- 238 P.2d 316 should read 238 P. 316.

WEST PUBLISHING COMPANY
Box 3526
St. Paul, MN 55165

It is clear that the purposes of the loans for which the $17,044,735 is authorized affects the inhabitants of the particular areas as communities, and not merely as individuals. The use of the loan proceeds will clearly be for public purposes. See Stanley v. Jeffries (1929), 86 Mont. 114, 284 P. 134; Hansen v. City of Havre (1941), 112 Mont. 207, 114 P.2d 1053; Lumberman's Trust Co. v. Ryegate (9th Cir. 1932), 61 F.2d 14.

## IX.

Art. V, § 1, 1972 Montana Constitution provides:

"The legislative power is vested in a legislature consisting of a senate and a house of representatives. The people reserve to themselves the powers of initiative and referendum."

Grossman insists that section 3(2) of Ch. 705, Laws of Montana (1983), (H.B. 885) delegates and grants to the Board of Natural Resources and Conservation the power and authority to determine the feasibility of the various water conservation projects and to make recommendations on the projects to the Board of Examiners. Grossman further contends that such delegation is unconstitutional in that it fails to set forth adequate standards with reasonable clarity or to place any limits on the discretion of the Board, and as such violates Art. V, § 1.

Section 3(2) is pointed toward the authorization of $45.35 million of coal severance tax bonds to finance hydroelectric power generating facilities at three state owned dams. The bonds however may not be issued until a determination of "feasibility" is made by the Board:

"(2) Bonds approved in this section may not be issued by the board of examiners until the board of natural resources and conservation has determined that a project is feasible and has otherwise complied with the requirements of Title 85, chapter

1, part 5, for the development of hydropower at
water projects under the control of the
department."

It must be remembered that the legislature has also
found in Ch. 705, Laws of Montana (1983), that the water
development program is an integral part of the implementation
and development of a comprehensive, multiple use water
resources plan; and that the hydroelectic developments at the
three dams here implement the state's policy of full use,
conservation and protection of its water resources. All that
the legislature has done in § 3(2), Ch. 705, Laws of Montana
(1983), is to add a proviso to its otherwise constitutional
authorization for bonds to the effect that feasibility under
Title 85, chapter 1, part 5, MCA, shall be determined by the
Board.

Contrary to the arguments of Grossman, there are
standards which impose with reasonable clarity limits on the
discretion of the Board in determining feasibility. These
are found in sections 85-1-501 and 85-1-502, MCA. Under
those statutes, the Department of Natural Resources and
Conservation is required to study the "economic and
environmental feasibility of constructing and operating" the
hydroelectric power generating facilities on each of the
water projects under its control and to update those studies.
The Department is to take into account the estimated costs of
construction, the estimated cost of maintaining, repairing
and operating the facility, the costs of tying into existing
power distribution channels, the ability of public utilities
or cooperatives to lease and operate such facilities, the
debt burden to be serviced, the revenue to be expected and
the likelihood of a reasonable return on the investment.

Once the Department has determined and made such studies, it then becomes the duty of the Board of Natural Resources and Conservation under section 85-1-502, MCA, to determine the feasibility of a project and whether the project is in the "best interest of the people of the state of Montana." What the legislature has really done in the enactment of Ch. 705, Laws of Montana (1983), and Title 85, chapter 1, part 5 is to integrate executive duties with its legislative responsibility to make a workable whole in the development of small scale hydroelectric power facilities for the public good.

Here the enactments of the legislature are complete and delegate to the Board of Natural Resources and Conservation and the Department of Natural Resources and Conservation administrative authority which is sufficiently clear, definite and certain to enable the agencies to know their respective rights and obligations. Huber v. Groff (1976), 171 Mont. 442, 558 P.2d 1124; Montana Milk Control Board v. Rehberg (1962), 141 Mont. 149, 376 P.2d 508. Determinations of economic and environmental feasibility are far more appropriate in the administrative sector than in the legislative branch. There is nothing improper, constitutionally or otherwise, in the legislature making its authorizations contingent upon administrative decisions properly made in the executive side of the state government.

X.

We have already set out in section V. of this opinion, the provisions of Art. VIII, § 14 and Art. IX, § 5 of the 1972 Montana Constitution.

In H.B. 846, Laws of Montana (1981), the legislature authorized issuance of not to exceed $10 million in coal

- 34 -

severance tax bonds for the State's share of the construction costs of the Tongue River Dam rehabilitation. Grossman attacks the authorization for such bonds upon the ground that the amount of money necessary to finance the project is not a definite or certain amount and therefore violates Art. VIII, § 14, and Art. IX, § 5.

The legislature found that the present Tongue River Dam is in a dangerously unsafe condition because of an undersized spillway; that a washout is possible from a flood which may be expected every 68 years; that the dam almost failed during a flood in the spring of 1978; and that a dam failure would result in devastating property damage downstream to the communities of Birney and Ashland. The legislature further found that an enlarged Tongue River Dam that is jointly funded by the federal government and the state government and jointly managed by the Northern Cheyenne Tribe, the Department of Natural Resources and Conservation, and the federal government can provide a cost effective means of preserving existing project benefits, provide water for future agricultural and tribal use, preserve recreational values and facilititate the negotiation of a compact between the Tribe and the Reserved Water Rights Compact Commission regarding tribal rights to water in the Tongue River.

At the time of the passage of the authorization for the Tongue River Dam bonds, it was, of course, impossible for the legislature to know the exact cost that the State might face in the rehabilitation project. Therefore, it authorized an issuance of up to $10 million of coal severance tax bonds as the State's "share of the construction costs of the Tongue River Dam rehabilitation" as established in a joint sharing of project costs between the state, the federal government,

and the Northern Cheyenne Tribe. The authorization is contingent upon legislative approval of a detailed project plan approved by the Board of Natural Resources and Conservation that includes a resolution of the Northern Cheyenne Tribe's water right conflicts in the Tongue River Basin, the appropriation of federal funds and a construction project approved by the Board of Natural Resources and Conservation and the legislature.

It should be recognized, though, that there are further financial fences set about the appropriation. Although the interest rate at which the bonds will be issued cannot be projected, the bonds may not exceed 40 years in duration, and may include provisions for redemption at earlier times. Section 17-5-710, MCA. The Board of Examiners may not issue coal severance tax bonds unless the aggregate amount of bonds outstanding, including any approved issue and any bonds authorized but not issued can be serviced with no more than two-thirds of the annual deposits into the coal severance bond fund as determined by the average of the deposits during the preceding three fiscal years. Section 17-5-709(2), MCA. This is in addition to safeguarding provisions relating to other sources of revenue.

Grossman bases his contention here on Art. VIII, § 14, which states: "Except for interest on the public debt, no money shall be paid out of the treasury unless upon an appropriation made by law and a warrant drawn by the proper officer in pursuance thereof." He contends that under State ex rel. Dean v. Brandjord (1939), 108 Mont. 447, 92 P.2d 273, a similar section of the 1889 Constitution was interpreted and this Court held that while the precise figure might not be nicely ascertained, there should be a maximum amount

contained in the authorization above which a warrant would not be drawn. Grossman states there is no such maximum contained in the acts under question.

In passing upon a similar objection in State ex rel. Toomey v. State Board of Examiners (1925), 74 Mont. 1, 10, 238 P.2d 316, this Court said:

> ". . . by the provisions of the Act in question, our legislative assembly exercised that power; the amount of principal is definite; and, when the treasury notes are sold, the rate of interest will be fixed within the maximum provided in the Act. Nothing is left then to the executive officers but a mathematical calculation. The rule that 'that is certain which can be made certain' applies to appropriations. (Citing authority.)"

In these days of fluctuating and sometimes volatile interest rates, no legislative assembly can be expected to project with any degree of confidence the interest rate which will meet the market for the issuance of state bonds. The cost of borrowed money appears to be beyond the control of any of us. Yet when the bonds are issued and sold, the interest rate to be paid by the State will become certain. The principal will be definite; the amounts annually necessary to service and repay the bond of indebtedness can be ascertained with mathematical precision. The rule applied in Toomey above, "that is certain which can be made certain" applies with full force here, and renders Grossman's contentions respecting vagueness and indefiniteness pointless.

## XI.

Grossman alleges that H.B. 846, Laws of Montana (1981), is not a complete appropriation and requires a further three-fourths vote of each house of the legislature in order to spend money from the constitutional trust fund as required by 1972 Mont. Const., Art. IX, § 5.

Grossman does not enlarge upon these allegations in his brief, nor does the State respond to the allegation.

If, in making the allegation, Grossman is contending that the Tongue River Dam Rehabilitation Bond Program, authorized by H.B. 846, Laws of Montana (1981) is a continuing appropriation which violates the constitution as discussed by us in section V above, we have already refuted that contention. Grossman may mean, however, that under H.B. 846, the appropriation is not complete because the authorization for the issuance of the bonds for the Tongue River Dam rehabilitation requires a further approval of the project by the legislature. With that possible contention, we do not agree.

The requirement for a three-fourths vote of the members of each house of the legislature is found in 1972 Mont. Const., Art. IX, § 5. It is a safeguard provision for use of the trust principal or income from coal severance taxes. H.B. 846 was approved by three-fourths of each house and is a valid and final authorization for the issuance of the bonds. We see no need for any further three-fourths vote. Once the project is approved, the state's share established, and the bonds issued, the legislature has effectively provided in a constitutional manner for the issuance of such bonds.

XII.

Lastly, Grossman contends that the appropriations of the coal severance tax trust funds, the investment disbursements to be made thereunder, the holding of the proceeds of coal severance tax funds by a trustee, and the use of the trust funds bond proceeds, violate 1972 Mont. Const., Art. VIII, §§ 12 and 13.

In essence, section 12 requires that the legislature insure strict accountability of all revenue received and money spent by the State. Section 13 requires the legislature to provide for a unified investment program for all public funds with rules therefor, including supervision of investment of such funds.

Grossman's attack with respect to strict accountability is apparently directed at section 17-5-711, MCA, which allows the Board of Examiners to appoint a trustee, which may be any trust company or bank having the powers of a trust company, by means of a trust indenture. However, the succeeding statute, section 17-5-712, MCA, provides that the trust indenture may set forth such rights and remedies of the bond holders as is customary in trust indentures and may include provisions for protecting and enforcing the rights and remedies of the bondholders, including covenants setting forth the duties of the State, the Board of Examiners, and the departments or agencies in the state government in relation to the acquisition, construction, improvement, maintenance, operation, repair, and insurance of the projects involved, and for the custody, safeguarding and application of all money.

In _Huber_, this Court approved an act which authorized the Montana Board of Housing to issue bonds secured by a trust indenture between the Board and a corporate trustee. We adhere to the discussion respecting the unified investment program in that case where we said:

> "The Constitution's provision for the unified investment fund does not require that all agencies participate regardless of the nature of the agency. Where, as here, the agency is not using state funds and is setting up what amounts to its own specialized investment fund with a particular purpose, it is reasonable to allow, as the

> legislature did, the agency to take care of its own
> funds in a manner appropriate to its function."
> 171 Mont. at 460, 558 P.2d at 1133.

We hold that the provisions made for the issuance for coal tax severance bonds for water resource development do not violate the "strict accountability" provision nor the unified investment provision of our Constitution.

## XIII.

Section 85-1-623, MCA, enacted as section 1, chapter 507, Laws of Montana (1981), authorizes the issuance of not more than $5 million of water development bonds. These bonds are to be distinguished from the coal severance tax bonds which are authorized in Ch. 705, Laws of Montana (1983), and H.B. 846, Laws of Montana (1981). Although the water development bonds are secured by a portion of the coal severance tax monies, section 85-1-603(2), MCA, the sources are separate from the trust monies from coal severance taxes that are covered by 1972 Mont. Const., Art. IX, § 5.

Grossman does not directly attack the validity of the water development bonds, though reference to the $5 million authorization contained in H.B. 846 has been made in briefs and in oral argument. Grossman's legal attack in his pleadings and his brief has been focused totally on the coal severance tax bonds, authorized under Ch. 705, Laws of Montana (1981); and H.B. 846, Laws of Montana (1981) relating to bonds for the Tongue River Dam. We have therefore confined our discussion in this opinion to the attacks made by Grossman on the coal severance tax trust fund bonds.

## XIV.

b26 It is, therefore, our conclusion and holding that the bonds proposed to be issued and sold by the State under the provisions of Ch. 705, Laws of Montana (1983), H.B. 885, Laws

of Montana (1981) and under H.B. 846, Laws of Montana (1981), relating to the Tongue River Dam, are valid enactments by the legislature, constitutionally provided for and safeguarded. We hold in favor of the defendants and against the plaintiff Ray Grossman on each and all particulars of the plaintiff's complaint and enter declaratory judgment in favor of the defendants. This opinion, without the filing of further instrument or order shall be and constitute a declaratory judgment to that effect.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices