STATE OF MONTANA ex rel. JOSEPH T. WARD, Plaintiff
and Relator, *v.* FORREST H. ANDERSON et al., Defend-
ants and Respondents.

No. 12132.
Submitted Oct. 4, 1971.
Decided Nov. 23, 1971.
491 P.2d 868.

Donald Garrity (argued), Helena, for relator.

Robert L. Woodahl, Atty. Gen., Helena, Walter S. Murfitt, Special Asst. Atty. Gen. (argued), Helena, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

Relator has filed an original proceeding in this Court seeking to permanently enjoin the State Board of Examiners from issuing certain "limited" obligation state bonds in the total principal amount of 13.2 million dollars. Issuance of these bonds was authorized by two measures enacted by the Forty-second Legislative Assembly of the State of Montana. By order dated September 8, 1971, this Court ordered defendants to appear and show cause why they should not be so enjoined.

House Bill No. 286, Chap. 222, Laws of 1971, authorized the State Board of Examiners to issue and sell long range building program bonds in an amount not exceeding $5,-500,000 over and above the amount of said bonds outstanding January 1, 1971 (Section 3, Chap. 222, Laws of 1971, codified as section 79-2205, R.C.M.1947). No general election to approve the issuance of these bonds is required or contemplated by this legislation. Repayment of these bonds is to be made

from a special fund composed of eleven percent of the state income and corporation license tax collections and a portion of the state cigarette taxes. Section 79-2203, R.C.M.1947.

House Bill No. 610, Chap. 356, Laws of 1971, authorized the State Board of Examiners to issue and sell bonds in a sum not exceeding $7,710,442 for the purpose of acquiring land for erecting and equipping a state highway commission headquarters building and complex. This bill also did not require an election to approve the issuance of these bonds. Repayment of these bonds is to be made from a special fund made up of the net proceeds from the collection of the license tax imposed on gasoline distributors by section 84-1847, R.C.M.1947.

This Court accepted jurisdiction. The defendants appeared by answer. The Court permitted Neil J. Lynch to appear amicus curiae. Oral argument was had.

Sections 79-2201 through 79-2205, R.C.M.1947, were first enacted in 1965 to provide for the issuance of long range building program bonds by the Board of Examiners. Pursuant to this legislation, the state of Montana has issued bonds the proceeds of which have been used to fund the state long range building program. The amount outstanding is approximately $33,000,000. The principal and interest on the bonds is payable from the sinking fund account to which is pledged a percentage of collections of the income tax and corporation license tax and a percentage of the collection of the excise tax on cigarettes and other tobacco products.

House Bills No. 286 and No. 610 were passed making the 13.2 million dollar authorization, in addition to those outstanding. Each bill contained the statement:

"* * * that they are not and shall never become a debt or liability of the state of Montana within the meaning of any constitutional or statutory limitation or provision, and that no ad valorem tax may be levied upon property within the state of Montana to pay principal thereof or interest thereon * * *."

Pursuant to the above laws, the Board of Examiners, on September 8, 1971, adopted resolutions providing for the issuance and sale of long range building program bonds and highway bonds.

The issues presented are:

1. Does defendants' proposed issuance of 5.5 million dollars in long range building program bonds, which are to be repaid from the state corporation license taxes, income taxes, and tobacco taxes, constitute the creation of a debt or liability within the meaning of Article XIII, Section 2, of the Montana Constitution?

2. Does defendants' proposed issuance of 7.7 million dollars in highway bonds, which are to be repaid from state gasoline taxes, constitute a debt or liability within the meaning of Article XIII, Section 2, of the Montana Constitution?

3. Is the use of gasoline tax monies to finance the construction of a state highway commission headquarters and complex prohibited by Article XII, Section 1b of the Montana Constitution?

As shall be developed hereinafter, Article IX, Section 2, of the Montana Constitution also comes into focus.

In the general election of 1932, the people of the state of Montana amended Article IX, Section 2, of the Montana Constitution to include the following language:

"If the question submitted concerns the creation of any levy, debt or liability the person, in addition to possessing the qualifications above mentioned, must also be a taxpayer whose name appears upon the last preceding completed assessment roll, in order to entitle him to vote upon such question."

In 1970, in City of Phoenix, Arizona v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523, the United States Supreme Court held that the provisions of the Arizona constitution and statutes excluding nonproperty owners from elections for the approval of the issuance of general obliga-

tion bonds violated the equal protection clause of the Fourteenth Amendment of the United States Constitution.

Earlier, in Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647, the Court held that a state may not restrict the right to vote in revenue bond elections to property taxpayers.

These decisions make it clear that that portion of Article IX, Section 2, of the Montana Constitution, quoted above, is invalid. The Montana Legislature recognized this by enacting Chapter 234, Laws of 1971, which allows all qualified electors to vote on local bond issues, and by voting to submit a proposed amendment to Article IX, Section 2, which will, if approved by the voters, delete the invalid requirement. Chapter 159, Laws of 1971.

As of now, that portion of Article IX, Section 2, of the Montana Constitution which restricts the franchise in certain elections to taxpayers is invalid.

Our view on Article IX, Section 2, becomes important only in considering the effect of Article XIII, Section 2, as will appear later.

Article XIII, Section 2, of the Montana Constitution provides:

"The legislative assembly shall not in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purpose to which the funds so raised shall be applied and provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof; *but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars (100,000)* except in case of war, to repel invasion or suppress insurrection, *unless the law authorizing the same shall have been submitted to the people at a general election*

*and shall have received a majority of the votes cast for and against it at such election."* (Emphasis supplied).

The history of revenue bonds, although in a different context, was discussed by this Court in Fickes v. Missoula County, 155 Mont. 258, 264, 470 P.2d 287. There it was said in part:

"There is a long history in Montana of the financing of various projects by revenue bonds as distinguished from general obligation bonds payable out of ad valorem property tax receipts. These have uniformly been held *not* to create a debt or liability within the meaning of Article XIII, Sec. 5, of our Constitution.

"This is true as to dormitory revenue bonds (Barbour v. State Board of Education, 92 Mont. 321, 13 P.2d 225); student union building bonds (State ex rel. Veeder v. State Board of Education, 97 Mont. 121, 33 P.2d 516); water conservation board bonds (State ex rel. Normile v. Cooney, 100 Mont. 391, 47 P.2d 637); housing authority bonds (Kraus v. Riley, 107 Mont. 116, 80 P.2d 864); and veterans bonus bonds (Cottingham v. State Bd. of Exam., 134 Mont. 1, 328 P.2d 907), just to give a few illustrations. The common quality of all these projects is that in each there is explicit provision that the public body issuing the bonds does not obligate its taxing power to pay for them. The same exact provision is written into the law and the bonds involved in this case, so that the same decision must necessarily be made in this case."

We reviewed some of the revenue bond cases of this Court culminating in the *Cottingham* case (Cottingham v. St. Bd. of Exam., 134 Mont. 1, 328 P.2d 907) upholding the Korean War Bonus Act. The reasoning in *Cottingham* is based strictly on the amendment to Article IX, Section 2, which we found effectively amended the words "debt or liability" as they appear in Article XIII, Section 2, by confining them to debts or liabilities which must be retired out of ad valorem taxes.

As we have shown heretofore, all that is changed by the United States Supreme Court rulings finding Article IX,.

Section 2, invalid as to the restrictive clause of the 1932 amendment. Therefore we re-examine the meaning of the terms "debt or liability."

Prior to *Cottingham,* this Court had ruled in State ex rel. Diederichs v. State Highway Commission, 89 Mont. 205, 296 P. 1033 (1931), that any state indebtedness in excess of $100,-000 which is to be repaid from any of the constitutional methods of raising public revenue (specifically gasoline license taxes in that case) is a debt or liability requiring the approval of the people at a general election. *Cottingham* did not overrule *Diederichs,* but distinguished it on the basis of the 1932 amendment to Article IX, Section 2. The reason for the distinction in *Cottingham* having now been abolished by the United States Supreme Court in *Cipriano, Cottingham* is no longer valid law.

Much of what this Court said in *Diederichs* is applicable today and to this case. There we said in part, after reviewing general rules of presumptions in favor of constitutionality, at page 210 of 89 Mont., page 1035 of 296 P.:

"Whether the act before us, strictly speaking creates a debt within the purview of this section 2, article XIII, a question upon which respective counsel have spent much effort, we think it unnecessary to decide, for in our opinion the act clearly imposes a liability within the contemplation of the section. The framers of the Constitution provided two methods of raising revenue for public purposes: one the taxation system and the other the license system. (State v. Camp Sing, 18 Mont. 128, 44 P. 516, 32 L.R.A. 635, 56 Am.St. Rep. 551.) Knowing the tendency of governments to run in debt, to incur liabilities, and thereby to affect the faith and credit of the state in matters of finance, thus imposing additional burdens upon the taxpaying public, the framers of the Constitution placed positive limitations upon the power of the Legislative assembly to incur a debt or impose a liability upon the state beyond the limit prescribed, without referring the proposition

to the electorate for its approval. As to this the comprehensive language of the section leaves no doubt. The first two sentences employ the word 'debt' and refer to debt alone, but the third adds the word 'liability,' a much broader term than 'debt.' Liability is a broad term, of large and comprehensive significance. In a broad sense it means an obligation one is bound in law or justice to perform. There are many other definitions. (36 C.J. 1050.) The authors of the Constitution used the term advisedly, with a definite purpose. In construing a constitutional provision it is our duty to give meaning to every word, phrase, clause, and sentence therein, if it possible so to do. So, whether the law authorizing a contract for the sale of these debentures creates a debt, such as is contemplated by the first two sentences of section 2, is not material. It certainly creates a liability, which includes a debt, for the state is expressly obligated not to reduce the excise taxes on motor fuels fixed by the 22d Legislative assembly and to cause the tax to be collected and paid to the debenture holders. This is prohibited by the plain terms of the Constitution, unless approved by the people.

"The fact that a special fund is created by the imposition of the license or excise tax on motor fuels with which to pay the debentures is of no importance.

"Under this contention the Legislature, or the debt-contracting authority, could divide the public revenue into numerous sub-divisions, calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the 'public health fund,' and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement

of the proposition carries with it, it seems to us, its own refutation. (Crick v. Rash, 190 Ky. 620, 229 S.W. 63.)

"The fund raised from the motor fuels' excise tax results from one of the constitutional methods of raising public revenues. (State v. Sunburst Ref. Co., 73 Mont. 68, 235 P. 428.) They are state funds, and the state has the right to devote the proceeds of this tax to any public purpose it sees fit. Originally the proceeds were paid to the general fund of the state. (Chapter 156, Laws 1921.) Subsequently, only a part was paid into the general fund. (Chap. 150, Laws 1923, and Chapter 186, Laws 1925.) The proceeds from this tax are unlike the fund involved in the case of State ex rel. Bickford v. Cook, 17 Mont. 529, 43 P. 928, 930. In that case the court was dealing with a trust fund, provided for by an act of Congress, not state funds, and the court in recognition of the importance of that fact said: 'The state cannot use the fund created by this act for any purpose except as provided for by the act of Congress. The state officers have no control over it, except to carry out the trust relation.' The same is true of State ex rel. Armington v. Wright, 17 Mont. 565, 44 P. 89, cited and relied upon by respondent. The act there under consideration did not create a debt nor impose a liability upon the state. The case of Crick v. Rash, supra, also comments upon the importance of this distinguishing feature.

"State ex rel. Rankin v. State Board of Examiners, 59 Mont. 557, 197 P. 988, also presented an entirely different situation. In that case the debt or liability was already in existence, represented by outstanding warrants when the treasury notes were issued. The issuance of the treasury notes simply changed the form of the existing indebtedness or liability, and did not create one. (Hotchkiss v. Marion, 12 Mont. 218, 29 P. 821; Parker v. City of Butte, 58 Mont. 531, 193 P. 748; Edwards v. Lewis and Clark County, 53 Mont. 359, 165 P. 297; State ex rel. Toomey v. State Board of Examiners, 74 Mont. 1, 238 P. 316.)

"The supreme court of Iowa, in a well-considered and powerful opinion, declared a somewhat similar act unconstitutional (State ex rel. Fletcher v. Executive Council, 207 Iowa 923, 223 N.W. 737, 743), while the Supreme Court of South Carolina, by a divided court, sustained an act also somewhat similar (State ex rel. Farr v. Moorer, 152 S.C. 455, 150 S.E. 269), but the constitutional provisions in Iowa and South Carolina are unlike ours.

"The creation of an obligation, payable from these funds, is a liability of the state; its effect is to divert a large part of the revenues of the state into the State Highway Fund for a period of ten years, which otherwise might be used to pay the public debt or to defray the general expenses of the government, thus relieving the heavy burden of taxes levied upon property. If the process designed by Chapter 1 does not create a state liability, then the Legislature undoubtedly could do the same thing with other license taxes, the inheritance taxes, and the net proceeds of mines taxes, all of which are properly considered in determining the limitation of expenditures and appropriations under section 12 of Article XII of our Constitution (State ex rel. Toomey v. State Board of Examiners, supra), and thus accomplish by indirection what the Constitution prohibits to be done directly.

"The people are gravely concerned as to how and the purposes for which their money is spent. They may eagerly desire to sell the proposed debentures, thereby matching the sums provided by a generous Congress, to the end that our state may be afforded good roads without delay; but another measure pledging excise taxes in large amounts for some special purpose might encounter their definite disapproval.

"These examples demonstrate, if any demonstration is needed, the salutary purpose of the constitutional provision here under consideration.

"We have reached this decision with a due sense of its great importance and only after a faithful effort to sustain the

law. Each member of the court has labored upon this case to the exclusion other court business ever since it was submitted to us. In the language of the supreme court of Iowa, in State ex rel. Fletcher v. Executive Council, supra: 'The responsibility thus facing us is one not of our seeking, nor of our liking, nor yet one which we would dare evade. We are assured, too, that in the long event the duty we owe, not only to the litigants, but to our co-ordinate departments of government, is to undertake frankly the judicial responsibility which litigation casts upon us, and to declare faithfully our judicial convictions therein. In such a case our primary concern is, and must be, directed to the soundness of our conclusion, and not to its consequences. Consequences are inevitable in every litigation and are commensurate with the magnitude thereof. They are not judicially made, nor can we make them less or more.' As the great Justice Story said in the Dartmouth College Case [Trustees of Dartmouth College v. Woodward] 4 Wheat. (U.S.) 518, 4 L.Ed. 629: 'We have nothing to do but pronounce the law as we find it; and, having done this, our justification must be left to the impartial judgment of our country.'

"The upshot is that in order to validate the act it must receive the approval of the electorate."

The foregoing reasoning in *Diederichs* is valid, and our duty is equally clear. Where provisions for payment of principal and interest on bonds impair the state's constitutional tax sources, it is at least a liability, if not a debt. In the instant case, House Bill No. 286 obligates eleven percent of the income and corporation license tax collections and a portion of the state cigarette taxes. House Bill No. 610 obligates gasoline license taxes. They both affect the liability of the state without approval of the electorate and are unconstitutional.

To further demonstrate in a practical as well as a legal way that a liability of the state is effected, we point out the effect

of the legislature's creating a special fund obligating eleven percent of the income tax collections, the corporation license tax collections and a portion of the state cigarette taxes. Under Title 75 of the Revised Codes of Montana, 1947, the school foundation program is set up. It is provided that "when required, moneys from an additional county levy for a state deficiency" shall be made. Thus, any impairment of the state's tax sources, such as here with eleven percent of income and corporation license taxes in addition to a portion of the state cigarette tax, directly results in higher ad valorem property taxes. Can it be any clearer why a "liability" is created by this means of deficit financing? We think not.

And, to make our rationale even more appropriate, we refer to Article XII, Section 1a, of the Montana Constitution, which was adopted by a vote of the people in 1934. That section reads:

"The legislative assembly may levy and collect taxes upon incomes of persons, firms and corporations for the purpose of replacing property taxes. These income taxes may be graduated and progressive and shall be distributed to the public schools and to the state government."

Thus, the Constitution itself provides that income taxes and corporation license taxes, those pledged in House Bill 286. are not only constitutional sources of tax revenue but are for the "purpose of replacing property taxes." The "liability" of the state is clear.

Previously herein, we quoted from *Fickes* where this Court reviewed some of the revenue bond cases culminating in *Cottingham*. In each of the cases reviewed, the pledged funds were funds from a proprietary function of government such as room rentals, student fees, water charges, and rents. Examples in other states of funds pledged are tolls, liquor profits as distinguished from taxes, profits from sales of electrical power, gas, sewer charges, etc. What we say here with regard

to constitutional revenue source does not affect bonds payable by revenue from the project created.

As we did in *Cottingham,* we have examined cases from other jurisdictions. In an annotation appearing in 100 A.L.R. 900, a collection of cases is discussed on debt limitation—payment from special fund. The annotation is a limited one and does not include cases where the anticipated income is from special assessments on property for local improvements; income from or sale of property; or, fees such as university student union buildings. The annotation states at p. 901:

"Although the cases are not entirely in accord and dissenting opinions have been frequent, it has generally been held that an obligation payable exclusively from a special fund created by the imposition of fees, penalties, or excise taxes, and for the payment of which the general credit of the state or municipality is not pledged and resort may not be had to property taxation, is not a debt within the meaning of constitutional debt limitations. Differences in constitutional and statutory provisions to some extent account for the differences in the reasoning and results of the various cases."

Our *Diederichs* case is listed as a contrary conclusion to what has been generally held. While there are differences in our constitutional provision from some of the states listed, in some of them there are no significant differences. The states of Washington, Oregon, Kansas, Alabama, New Mexico, Texas and South Carolina have gone one way, while Colorado, Montana, Kentucky and Oklahoma are listed the other way.

Subsequently, we find four more states listed. Arizona in 1969, held that highway right of way acquisition bonds to be paid from gasoline taxes did not violate Arizona's constitutional debt limitation because it was payable from a special fund, the highway fund which was pledged as security and which could not be expended for any other purpose, under an anti-diversion amendment similar to our Article XII, Sec-

tion 1b. The Arizona court quoted from the Washington case of State ex rel. Washington State Finance Committee v. Martin, 62 Wash.2d 645, 384 P.2d 833, concerning the "special fund" doctrine.

Florida, in State v. Board of Public Instruction, Okaloosa Co., Fla., 214 So.2d 723, found county limitations not applicable to school bonds pledged by motor vehicle license tax funds, race track funds, and receipts of state forest funds, as not violative of the provisions because they were not payable from ad valorem taxes.

Nebraska, in State ex rel. Meyer v. Steen, 183 Neb. 297, 160 N.W.2d 164, 167, held unconstitutional bonds for a game and parks commission headquarters, payable from the state game fund. The Nebraska court rejected the special fund doctrine citing Boe v. Foss, 76 S.D. 295, 77 N.W.2d 1, for the principle that:

"The ultimate incidence of any debt which consumes an existing public income or resource is on the taxpayer. He cannot be insulated from that impact by the device of a special fund."

South Carolina in Mims v. McNair, 252 S.C. 64, 165 S.E.2d 355, reaffirmed its previous rulings that bonds pledged by income taxes were not violative of its constitution. That court used the special fund doctrine and held that so long as no resort is made to real property taxes, no "debt" is involved.

Utah in Allen v. Tooele County, 21 Utah 2d 383, 445 P.2d 994, held constitutional industrial development bonds in a case similar to our *Fickes* case. It also used the special fund doctrine.

Thus, Florida can be added to states limiting "debt" to property taxes. Nebraska and probably Utah can be added to states giving a meaning to "debt or liability" as any diminishing of state's taxing power. Arizona has a somewhat new twist, that is—where the people have voted to create a

"special fund" as in the anti-diversion amendment, no debt is created. This does not recognize a "liability."

In all of the cases from other jurisdictions cited above, in 100 A.L.R., and in *Cottingham* it is not possible to harmonize the results. However, the limitations on amounts of debts or liabilities would be held meaningless if "special funds" created from excise or license taxes could be obligated against future generations in untold amounts.

The Court in *Diederichs* in 1931, agonized with its conscience in declaring the highway bonding act unconstitutional. Here, we do likewise, fully realizing that the state's building program will be most seriously affected.

As we said in *Diederichs, there* are two ways to handle the problem, one by amendment to the Constitution; the other by a vote of the people on bonding programs. Another method now may arise in the coming Constitutional Convention.

Since *Cottingham* is invalid, the language appearing in *Fickes* and other cases should be restricted to what we have said here.

Heretofore, we have alluded to other Montana cases where revenue bonds were held not to violate the $100,000 debt limitation. In most of those, except *Diederichs* and *Cottingham,* nontax or nonrevenue obligating sources were looked to. However, we have also alluded to the $33,000,000 in revenue bonds outstanding. The long range building program bonds were issued as follows:

| | |
|---|---:|
| September 1, 1965 | $ 8,640,000 |
| September 1, 1967 | 11,050,000 |
| November 3, 1969 | 500,000 |
| June 1, 1970 | 4,670,000 |
| June 1, 1970 | 6,675,000 |
| September 1, 1970 | 6,055,000 |
| Total issued | $37,590,000 |

This total amount has been reduced to an amount in excess of $33,000,000.

It is clear that these bonds were issued in the good faith assumption that the restriction of the franchise in bond elections was not prohibited by the federal constitution and that the rule in *Cottingham* would be applicable. It is equally clear that we should not give our decission retroactive effect. The United States Supreme Court in Phoenix, Arizona v. Kolodziejski, 399 U.S. 204, 214, 90 S.Ct. 1990, 26 L.Ed.2d 523, 530, handled the matter of retroactivity in this manner:

"We therefore adopt a rule similar to that employed with respect to the applicability of the *Cipriano* decision: our decision in this case will apply only to authorizations for general obligation bonds that are not final as of June 23, 1970, the date of this decision. In the case of States authorizing challenges to bond elections within a definite period, all elections held prior to the date of this decision will not be affected by this decision unless a challenge on the grounds sustained by this decision has been or is brought within the period specified by state law. In the case of States, including apparently Arizona, that do not have a well-defined period for bringing challenges to bond elections, all elections held prior to the date of this decision that have not yet been challenged on the grounds sustained in this decision prior to the date of this decision will not be open to challenge on the basis of our ruling in this case. In addition, in States with no definite challenge period, the validity of general obligation bonds that have been issued before this decision and prior to the commencement of an action challenging the issuance on the grounds sustained by this decision will not be affected by the decision in this case. Since appellee in this case brought her constitutional challenge to the Phoenix election prior to the date of our decision in this case and no bonds have been issued pursuant to that election, our decision applies to the election involved in this case. The District Court was there-

fore correct in holding that the June 10, 1969, bond election in Phoenix was constitutionally invalid and in enjoining the issuance of bonds pursuant to the approval obtained in that election."

■ Accordingly, here the ruling of unconstitutionality does not affect the validity of bonds previously issued but does affect those proposed to be issued under House Bills No. 286 and No. 610.

Having ruled on issues 1 and 2, it is not necessary to rule on issue 3, that is, the so-called anti-diversion amendment's application to the highway complex proposal.

It follows that the injunction prayed for must issue, to be in force unless the law be submitted to, and receive the approbation of, the people.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES HASWELL, DALY and JOHN C. HARRISON, concur.