Harry EAKIN, Auditor of Marion
County, Appellant,

v.

STATE ex rel. CAPITAL IMPROVE-
MENT BOARD OF MANAGERS
OF MARION COUNTY, Appellee.

No. 784S294.

Supreme Court of Indiana.

Feb. 15, 1985.

City-County Legal Div., John P. Ryan, Corp. Counsel, James B. Burroughs, Mark Dall, Indianapolis, for appellant.

G. Daniel Kelley, Jr., Stephen M. Terrell, Ice, Miller, Donadio & Ryan, Indianapolis, for appellee.

GIVAN, Chief Justice.

This cause comes before this Court pursuant to Ind.R.App.P. 4(A). The issues involve an attempt by the Capital Improvement Board (CIB) to refinance construction bonds which were first issued in 1982 to finance a substantial addition to the Indianapolis Convention Center.

The government of the City of Indianapolis and that of Marion County are unified. The legislative branch of the government is the City-County Council.

The Indiana General Assembly in 1981 enacted a series of statutes which provided a mechanism for the financing of the proposed expansion of the Indianapolis Convention Center including a sports stadium. The legislation granted to the City-County Council of Marion County the authority to impose certain excise taxes to repay the construction bonds which were to be let to finance the expansion.

The revenue scheme authorized by statute and enacted by the City-County Council consisted of three separate excise taxes. The first was a 1 percent tax on the sale of food and beverages sold for immediate consumption on or near the premises at retail establishments in Marion County. This tax was authorized by Ind.Code § 6–9–12–1 *et seq.* (West Supp.1984). The second was a 5 percent tax on admissions to professional sporting events held in the Indianapolis Convention Center. This was premised on Ind.Code § 6–9–13–1 *et seq.* (West.1982). The last tax was a hotel/motel tax which

was based on Ind.Code § 6–9–8–1 (West 1982).

The revenues collected under these taxes were to be placed in a trust fund, the Capital Improvement Board Fund (hereinafter "Fund"). This Fund and the operating revenues of the Indianapolis Convention Center are the only funds pledged to the retirement of the construction bonds. The bonds are payable solely from these sources. With this procedure in place, the CIB sold construction bonds totalling slightly more than $47,000,000 in 1982.

In an effort to respond to a lowering of interest rates, the CIB, the managers of the Indianapolis Convention Center and overseers of the Fund, passed a resolution in February, 1984, authorizing the issuance of two new series of bonds to refinance the 1982 bonds. Series A bonds, with a value of $55,000,000, were to be issued to refinance the old bonds. Series B bonds totalling $9,000,000 were to be used to convert short term debt into long term debt.

The Mayor of Indianapolis placed his required signature on the resolution. However, the Auditor of Marion County, Harry Eakin, refused to affix his signature to the bonds. This is required to attest to the seal of Marion County which in turn is required to issue the bonds. The CIB brought suit to mandate Eakin to attest to the seal. The trial court granted judgment in favor of the CIB and ordered Eakin to comply. Eakin then brought this appeal. We reverse.

Appellant Eakin contended at trial and in this appeal that the bonds in question are to be considered a debt of Marion County and that the face amounts of the bonds will place Marion County over the 2 percent limitation proscribed in Article 13, § 1 of the Indiana Constitution. This section provides:

"Section 1. No political or municipal corporation in this State shall ever become indebted in any manner or for any purpose, to an amount, in the aggregate, exceeding two per centum on the value of the taxable property within such corporation, to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness, and all bonds or obligations in excess of such amount given by such corporations shall be void: *Provided,* That in time of war, foreign invasion, or other great public calamity, on petition of a majority of the property owners, in number and value, within the limits of such corporation, the public authorities, in their discretion, may incur obligations necessary for the public protection and defense to such amount as may be requested in such petition."

The parties by stipulation agree to the following: The total assessed valuation of Marion County on the date of the refusal was $3,856,836,303 and that 2 percent of that total is $77,136,726; the current indebtedness excluding the $47,000,000 of 1982 bonds to be refinanced was $22,025,000; and, the two new bonds, coupled with the existing debt, would be in excess of the 2 percent limitation.

The trial court found the new bonds were not a debt within the scope of Article 13 and thus were not properly attributable to the total bonding limitation on Marion County. The trial court reached this conclusion on three alternative grounds. The court first found the 2 percent indebtedness limitation related solely to debts payable from *ad valorem* property taxes. The court concluded the limitation does not apply to debts payable from other revenue sources such as excise taxes. Secondly, the court found these bonds were within the "Special Funds" doctrine exception to the limitation. Bonds meeting the test of this exception are not counted as the debt of the local governmental unit. Lastly, the trial court found the taxing method was tantamount to revenue bonds and thus was outside the debt limitation. We disagree on all three grounds.

The first holding of the trial court places before this Court a question of first impression. The intent of the framers of the Constitution is paramount in determining the meaning of a provision. *State*

*Board of Tax Commissioners v. Key Motors Corp.* (1980), Ind.App., 404 N.E.2d 52. To properly determine the meaning of a provision the Court should consider the purpose which induced the adoption. *State ex rel. Black v. Burch* (1948), 226 Ind. 445, 80 N.E.2d 294. The words of the Constitution must be presumed to have been carefully chosen so that each word has a meaning. *Chadwick, Treasurer v. City of Crawfordsville* (1940), 216 Ind. 399, 24 N.E.2d 937. The words of the Constitution should be construed in a manner consistent with their ordinary sense and their common meaning should be attributed to them. *Tucker v. State* (1941), 218 Ind. 614, 35 N.E.2d 270.

 This Court in a prior decision concerning the purpose of Article 13 stated: "The purpose of the constitutional provision is to limit the public indebtedness, which would be a burden upon the public and payable out of taxes or by the sale of property." *Edwards v. Housing Authority of the City of Muncie* (1939), 215 Ind. 330, 338, 19 N.E.2d 741, 745. We believe this is still the purpose. The plain meaning of Article 13 is clear—a local governmental unit may not incur total indebtedness which exceeds 2 percent of the value of the taxable property within its boundaries. The intent of the framers was to construct limitation of indebtedness for the benefit of both present and future generations. It is through this limitation the interests of the generations are protected from being saddled with spending excesses. Any interpretation of Article 13 which ignores this principle is violative of the Article and must not be tolerated.

 There are a number of financial liabilities in the public domain which are not included within the term "indebtedness" of Article 13. One type of liability not included is debts within the "special taxing district" exception. In *Dortch v. Lugar* (1971), 255 Ind. 545, 572, 266 N.E.2d 25, 42, the Court explained this exception:

"[T]he Legislature may create such special taxing districts for local public improvements and provide for the levy of special ad valorem taxes throughout the district based upon the benefit accruing to the property holders therein situated; the Legislature may determine the boundaries of such districts or delegate to an agency the power to so determine them, *conforming or not* to the political or governmental subdivision there located; the Legislature may designate the agency to perform the administrative functions necessary on behalf of the district; and obligations so incurred by such a district payable out of the special benefit ad valorem tax are not debts of a municipal corporation within the provisions of Art. 13, § 1, of the Indiana Constitution." (Emphasis in original.)

 This exception has been subdivided into two exceptions: The "Special Funds" doctrine and the revenue bond exception. Additionally, a contractual arrangement between the municipality and a provider of usual and necessary items, such as water or lights, which calls for the governmental unit to pay in monthly or annual installments, does not create a debt in the amount of the aggregate payments due over the life of the contracts. *City of Valparaiso v. Gardner* (1884), 97 Ind. 1. The CIB asks this Court to create a new exception to Article 13 by holding that indebtedness which looks to a revenue source other than *ad valorem* property taxes for repayment is not an indebtedness within the scope of Article 13.

The CIB first argues Article 13 is a single sentence document which speaks of two subjects, a debt limitation expressed in terms of property valuations and a debt escape clause also tied to property tax values. The CIB thus maintains the framers must have intended there to be a relationship between the level of the debt, the debt escape clause and the nature of the debt so limited. The CIB contends the intention of the framers was that the limitation should only apply to debts which have as their source of repayment the funds collected by the property tax. It is further argued that if the framers had intended the limitation to apply to all forms of revenue sources,

the framers would have used language to that effect. Thus, the absence of reference to other revenue sources coupled with the two references to property taxes leads to the conclusion the limitation was directed at only indebtedness to be retired by *ad valorem* property taxes.

The CIB cites *State v. Connelly* (1935), 39 N.M. 312, 46 P.2d 1097. The court in *Connelly* found an indebtedness to be retired by a special excise tax was not a debt within the debt proscribed by a debt limitation clause similar to that of Article 13. The CIB also cites *Cottingham v. State Board of Examiners* (1958), 134 Mont. 1, 328 P.2d 907, a case relied upon by the trial court, and *City of Phoenix v. Phoenix Civ. Aud. & Conv. Ctr. Ass'n.* (1966), 100 Ariz. 101, 412 P.2d 43.

We do not agree with the CIB's argument. The exception to Article 13 sought by the CIB would effectively remove all restrictions on the indebtedness limits on a local governmental unit. A municipal government would only need to designate a revenue source, other than property taxes, to pay for a specific improvement and there would be no limit on the debt which could be generated. This is a violation of the spirit and the intent of Article 13. We believe the existing exceptions to Article 13 provide sufficient mechanisms to permit local governmental units to marshall necessary funds for their legitimate activities.

Our attention now turns to the application of the recognized exceptions to the Article 13 prohibition to the facts of the case at bar.

█ Revenue bonds may be issued in the name of a county or city which do not create an indebtedness within the provisions of Article 13 if the bonds are to be payable solely from a fund created by revenues from the project for which the bonds were sold. *Letz Mfg. Co. v. Public Service Commission of Ind.* (1936), 210 Ind. 467, 4 N.E.2d 194; *Underwood v. Fairbanks, Morse and Co.* (1933), 205 Ind. 316, 185 N.E. 118.

The CIB argues the Fund for repayment of the bonds may be created by applying a tax on sales or revenues generated by the project. This argument envisions a revenue scheme not based directly on revenues from the project, i.e. rental of space, but rather a derivative action in which the economic benefits which flow from the project are tapped through taxes. The traditional revenue bond arrangement would have the bonds being repaid from a fund consisting of the monies generated by the operation of the Indianapolis Convention Center. A portion of the money pledged to the repayment of the bonds is to come from operating revenues.

█ The CIB would expand this traditional arrangement in two ways. First, it argues the Fund may be supported not only by revenue but also by a tax on revenues. The admission tax on tickets to professional sporting events within the Indianapolis Convention Center is a clear example of a direct tax on the generated revenues. We find no harm in this arrangement as long as there exists a nexus between the revenue taxed and the project for which the bonds were issued. Thus, we believe a tax on admissions to events within the Indianapolis Convention Center is properly classified as revenue for the purpose of the exception.

The CIB fails in its second expansion of the revenue bond rule. The CIB classifies as revenue, for the purpose of this revenue tax, the income from the hotel/motel industry and the retail food service industry of Marion County. The CIB maintains the income of these groups is properly attributable as income of the Indianapolis Convention Center and thus subject to a revenue tax discussed above. Economic impact studies do indicate a significant increase in the sales of these two segments of the economy as a result of the expansion. However, to argue all retail food and lodging income in Marion County is directly or indirectly related to the existence of an expansion of a preexisting facility is untenable. These industries predated the facility and they would continue if the Indianapolis

Convention Center were to close tomorrow. We hold the tax on the revenue of the hotel/motel and retail food businesses of Marion County do not have a sufficient nexus to the operation of the center to be classified as revenue of the Indianapolis Convention Center and thus meet the requirement of the exception.

The trial court also found the bonds were not an indebtedness of Marion County under the other wing of the "special taxing district" exception to Article 13, the "Special Funds" doctrine. This topic has been litigated on several occasions in Indiana. This Court provided a review of the historial background of this doctrine in *Department of Public Sanitation v. Solan* (1951), 229 Ind. 228, 97 N.E.2d 495. The Court outlined in *Solan* the test to be applied in determining when a particular public improvement's financing arrangement fell within the exception. This Court said:

"If the statute in question authorized the property owners of the taxing district legally to bind themselves in the construction and maintenance of a local public improvement (not political or governmental in nature) for the use of those who receive the special benefit thereof, and of the public, the debt contracted is the debt of the taxing district and not that of the political or governmental subdivision that executed the evidence of indebtedness under command of the statute and does not constitute a debt of such political or governmental unit. In such case the tax or assessment is based upon the theory that it is a return for the benefit received by the persons who pay the tax or by the property assessed." *Id.* at 238, 97 N.E.2d at 500.

This Court then discussed the means by which the fund might raise the capital.

"It has long been the law that the funds essential to pay for a special public improvement may be raised either by an assessment on real estate specially benefited, or by a general tax on all the property, real and personal located in the taxing district, since personal property may be benefited as well as real estate.

The method to be followed in securing the funds is for the legislature to determine. (Citations omitted.) The method it selects—whether a special assessment on real estate benefited or a general tax on all the property in the taxing district, is nevertheless in the nature of an assessment of benefits to the persons and property taxed, by the legislature in the exercise of its sovereign power of taxation, and it does not constitute a debt of the political or governmental subdivision within the meaning of Art. 13 of the Indiana Constitution. Such debt is only that of the special taxing district." *Id.* at 239, 97 N.E.2d at 500.

Later in *Archer, Jr. v. City of Indianapolis* (1954), 233 Ind. 640, 122 N.E.2d 607, this Court defined the term "special taxing district" in the following manner:

"For present purposes, a taxing district may be defined as a new and separate territory within which a special assessment may be levied and collected on an ad valorem basis on the taxable property within the district for the purpose of providing funds to pay for local public improvements (not political or governmental in nature), which improvements have been determined by the Legislature to be of special benefit to the people and property within that territory." *Id.* at 644–645, 122 N.E.2d at 609.

We hold these tests are still the law in Indiana.

 Applying those standards to the facts in the case at bar we reach the following conclusions. The legislature in providing the enabling statutes has provided a means whereby the unified government of Indianapolis and Marion County may, through a Capital Improvement Board, build and finance various capital improvements including the subject matter of this litigation. This does not mean that such enabling statutes automatically create a "special taxing district" which is an exception to the prohibition of Article 13 of the Indiana Constitution. There is no language in either Ind.Code § 36–10–9–1 *et seq.* or Ind.Code § 6–9–12–1 *et seq.* which

speaks of the establishment of a "special taxing district." In the latter statute there is no attempt to evade the 2 percent debt limitation fixed by Article 13 of the Indiana Constitution. The tax authorized is not against the general property in the district such as would be required under *Department of Public Sanitation, supra,* or any of the other cases concerning "special taxing districts" nor is it assessed against all parties directly or indirectly benefiting from the Indianapolis Convention Center.

With the absence of any direct reference by the legislature to a taxing district and with the nature of the tax authorized under the statutes, we can only presume that the legislature intended to preserve the 2 percent debt limit required under Article 13 of the Indiana Constitution.

This cause is therefore remanded to the trial court with instructions to enter judgment not inconsistent with this opinion.

PRENTICE and PIVARNIK, JJ., concur.

HUNTER, J., dissents with separate opinion in which DeBRULER, J., concurs.

HUNTER, Justice, dissenting.

It is with grave concern that I respectfully dissent from the majority opinion. I believe their interpretation of Article XIII, section 1, is incorrect and is not consistent with the rationale of previous cases of this Court. I would affirm the trial court's finding that the bond issue in this case is not an "indebtedness" that falls within the limitations of our Constitution.

This Court has considered Article XIII, section 1, on several previous occasions and has consistently been guided by the well settled principles that phrases and sections must be considered in their entirety and the Court cannot be guided solely by the meaning of a word standing alone. *Allen v. Van Buren Township,* (1962) 243 Ind. 665, 673, 184 N.E.2d 25, (the word "value" was held to mean the "assessed value" of the property); *City of Valparaiso et al. v. Gardner,* (1884) 97 Ind. 1, 15 (the term "indebtedness" does not include obligations under contracts for necessary city services).

The majority in this case has looked at the phrase "indebted in any manner" and found that there is such a clear meaning to those words that it is not necessary to consider *any* of the context in which the phrase is found. I do not agree. This Court rejected that argument over one hundred years ago when it held that the word "debt" could not be said to have a firmly settled meaning. *City of Valparaiso,* 97 Ind. at 6. We have continually rejected a narrow interpretation of Article XIII, section 1, as we stated in *Lurie v. City of Indianapolis,* (1964) 245 Ind. 457, 199 N.E.2d 699:

> "Fortunately the well-reasoned opinions of most Indiana decisions for many years have refused to extend the meaning of the debt limitation provision of the Indiana Constitution to prohibit the creation of new political subdivisions or the financing of local public improvements by bond issues paid for by assessments or special taxes. The common law imposed no debt limitation whatever, and we should not at this late date attempt to turn the clock backward by engrafting additional words into the debt limitation provision of the Indiana Constitution to make it more restrictive than at the time of its enactment."

*Lurie v. City of Indianapolis,* 199 N.E.2d at 699 (Supplemental Footnote). *See also South Bend Public Transportation Corp. v. City of South Bend,* (1981) Ind., 428 N.E.2d 217; *Hawkins v. City of Greenfield,* (1967) 248 Ind. 593, 230 N.E.2d 396.

Clearly, it is the *constitutional sense* of the word "indebtedness" which we must determine. To do this, we must look carefully at the entire context in which the word is used. Article XIII, section 1, is in fact a *single* sentence which covers two subject matters, a debt limit and a debt prohibition with an escape clause from the debt limit. Both subjects are drawn solely with respect to *ad valorem* property taxes. The debt is limited to two percent of the value of the taxable property. This debt

limit is not stated in terms of a percentage of all tax revenues or other similar general terms, but is clearly stated to be based upon a percentage of *property* tax revenues. Furthermore, the debt limit can be avoided only through a petition of a majority of property owners in *number* and *value*. This escape clause is also firmly related to *property* taxes. This relationship of both the escape clause and debt limit to property taxes is very explicit and direct and since the debt prohibition is within the same sentence it is obvious that there was an intended relationship among the nature of the debt, the limitation of the debt and the debt escape provision. Rather than ignoring the nature of the debt limit in construing the phrase "indebted in any manner" and ignoring the debt escape provision, this Court should construe "indebted" in the context of how the debt is limited and how that debt limit can be escaped.

It is then clear that "indebted" encompasses only those obligations which look to general *ad valorem* property taxes for retirement and not obligations which are to be retired by excise taxes.[1]

I see no merit to the argument that the total assessed property value was chosen as the means of limitation because it was the only fixed and stable measure of the wealth of a municipal corporation. There is a wide variety of measures which are used by other states for debt limits, including revenues for the current fiscal year, a total of the income and revenue for a current year, and a flat dollar amount. Thus, the use of a debt limit based upon property values is a clear indication that the term "indebtedness" refers solely to debts which are payable from *ad valorem* property taxes.

Similarly, the debt escape provision is specifically related to the *ad valorem* tax since it is the majority of property owners "in number and value" who must vote in favor of exercising the escape provision. The intent here is clearly that the property taxpayers who actually paid the majority of the property taxes would determine whether or not to use the escape provision. Thus, this provision is related explicitly and directly to property taxes.

I believe the meaning of Article XIII, section 1, is clear when the section is read and considered as a whole and the debt which is limited is debt which is to be retired by the general *ad valorem* property taxes and *not* debt to be retired by excise taxes. I do not believe this interpretation would remove all restrictions on the indebtedness of a local governmental unit as the majority contends. The necessity of financing public improvements in an equitable manner will always be a matter of concern for our legislators. At some point, they may decide to place a cap on the amount of excise taxes which can be imposed by a given municipality. Our Constitution, as it now stands, does place a cap on the amount of debt to be repaid from *ad valorem* property taxes and does help shift the tax burden to the members of the public who most directly benefit from a public improvement rather than throw all of the burden on property owners who pay the *ad valorem* property taxes in a particular area. This Court is not called upon to make a policy decision as to whether there should be an absolute debt prohibition for municipalities and counties as there is for the state under Article X, section 5. The issue for this Court is the meaning of Arti-

---

**1.** Another similar Indiana constitutional provision has been limited solely to *ad valorem* property taxes. The original 1851 version of Article X, Section 1, provided:

"The General Assembly shall provide by law, for a uniform and equal rate of assessment and taxation; and shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real and personal, excepting only a municipal, educational, literary, scientific, religious, or charitable pur-

pose, as may be specifically exempted by law."

In spite of the general reference in Article X, Section 1, to "taxation," this Court has uniformly limited this Article to *ad valorem* property taxes due to the context of the word "taxation." *See Lutz v. Arnold,* (1935) 208 Ind. 480, 193 N.E. 840, 849; *Gafill v. Bracken,* (1924) 195 Ind. 551, 145 N.E. 312; and *Thomasson v. State,* (1860) 15 Ind. 449, 451.

cle XIII, section 1, as it is considered in its entirety.

I agree with the trial court's finding here that case law from other jurisdictions also supports the conclusion that this section refers to debts which are to be retired out of property taxes. It is true that the cases in other jurisdictions are divided as to whether or not their own constitutional debt limits include only debts to be retired from *ad valorem* property taxes and not debts to be retired by excise taxes. However, the key point in analyzing these cases is that each court carefully considered the *specific constitutional provisions* which were applicable and found that when a particular constitution limited debt in terms of a percentage of assessed values for *ad valorem* property tax purposes and had an approval or escape provision conditioned on a voter qualification of those paying property taxes or owning property, that constitutional provision was held not to encompass a debt to be retired solely by excise taxes. *City of Phoenix v. Phoenix Civic Center*, (1966) 100 Ariz. 101, 412 P.2d 43; *Switzer v. City of Phoenix*, (1959) 86 Ariz. 121, 341 P.2d 427; *Cottingham v. State Board of Examiners*, (1958) 134 Mont. 1, 328 P.2d 907; *Banner v. City of Laramie*, (1955) 74 Wyo. 429, 289 P.2d 922; *State v. Connelly*, (1935) 39 N.M. 312, 46 P.2d 1097.

While several jurisdictions have reached the result that the debt limits in their constitutions *do* include debts to be retired by excise taxes, their decisions are always the result of their constitutional provisions lacking a clear indication that the prohibited debts were tied to *ad valorem* property taxes.

Some states have specifically differentiated between state debt limit provisions and municipal debt limit provisions, and Montana has even reversed its position as to the type of debts which were subject to the debt limitation, but all of these cases are based upon a consideration of the specific constitutional provisions which apply.

In Wyoming, the court has expressly differentiated the state debt limit provision from the municipal debt limit provision and held that a debt to be retired by excise taxes is within the state debt limit but is not within the municipal debt limit. *Witzenburger v. State*, (Wyo.1978) 575 P.2d 1100. The court, there, found no special voter qualification clause in either debt limit provision and had to consider other factors. The Montana Supreme Court did subsequently change the holding of *Cottingham* but only after the requirement of voter approval encompassing only those on the property taxpaying rolls was found to be unconstitutional. There was then no provision in the Montana constitution which tied the debt limit to *ad valorem* property taxes. *State v. Anderson*, (1971) 158 Mont. 279, 491 P.2d 868.

In summary, I can find no cases from other jurisdictions which are inconsistent with my analysis that when there are specific provisions that a debt limit is based upon a percent of property tax revenues as well as an escape clause with voter qualification limited to property taxpayers, then the debt prohibited or limited is one to be retired by *ad valorem* property taxes.[2] The case law from other jurisdictions supports my conclusion that the authors of our Constitution intended not to overburden property taxpayers by limiting the amount of debt that could be incurred which was to be repaid out of *ad valorem* property taxes.

In this case, the bonds are to be repaid entirely from the special Fund set up by the CIB and the operating revenues of the expanded Indianapolis Convention Center and Hoosier Dome. There is no obligation or liability of the general credit of the state or of any municipality, and resort may not be had to *ad valorem* property taxes. In my judgment, the authors of Article XIII, section 1, were principally concerned with the protection of the general taxpayers and particularly their property from onerous

---

**2.** One court did apparently rule contrary to my present interpretation but *did not analyze* its own constitutional provisions and so cannot be said to be authority either in support or opposition to my position. *City of Trinidad v. Haxby*, (1957) 136 Colo. 168, 315 P.2d 204.

financial obligations. The use of excise taxes limited to specific and related projects clearly falls outside the intended parameters of the constitutional sense of "debt."

I believe the majority commits grievous error and seriously hampers the ability of the municipalities of this state to cope with the realities of the financial world and at the same time provide the necessary facilities to attract new residents and industries. I agree with the trial court that the new bonds of the Capital Improvement Board are not a debt within the scope of Article XIII, section 1, and are not properly attributable to the total bonding limitation on Marion County.

I would affirm the judgment of the trial court.

DeBRULER, J., concurs.